Gary L. Eastman  (CSB #182518)
Eastman & McCartney LLP
401 West A Street, Suite 1785
San Diego, CA 92101
Tel: (619) 230-1144
Fax: (619) 230-1194

Attorney for Plaintiff, Veracity Wireless, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT

| | |
|---|---|
| VERACITY WIRELESS, INC., a California  Corporation,<br><br><br>                    Plaintiff,<br><br>    vs.<br><br><br>VIRTUAL FLEET MANAGEMENT, LLC, a Texas Limited Liability Company," and DOES 1-20<br><br>                    Defendant. | Case No.:    **'17 CV 0295 BTM BLM**<br><br>**COMPLAINT FOR DECLARATORY RELIEF RE:**<br>**(1) NON PATENT INFRINGEMENT;**<br>**(2) INVALIDITY OF PATENT; AND**<br>**(3) UNFAIR COMPETITION UNDER STATE LAW**<br><br>**[JURY TRIAL DEMANDED]**<br><br>**(28 U.S.C. §§ 1331, 1332, 1338, 1367, 2201, 2202; California Business and Professions Code §§ 17200 *et. seq.*)** |

Comes now the Plaintiff VERACITY WIRELESS, INC. (hereinafter referred to as "Veracity") and for its Complaint alleges as follows:

**THE PARTIES**

1.      Plaintiff Veracity is a corporation duly organized and at all times relevant hereto in good standing under the laws of the State of California, qualified to do business in California, with its principal place of business at 8305 Vickers St., Ste 1111, San Diego, California, 92111, within the Southern District of California.

2.     Defendant VIRTUAL FLEET MANAGEMENT, LLC (hereinafter referred to as "Virtual Fleet Management") is, on information and belief, a limited liability company organized on January 21, 2016 and existing under the laws of the State of Texas with its principal place of business at 525 Mist Flower Drive, Little Elm, Texas 75068.

## JURISDICTION AND VENUE

3.     On information and belief, Defendant has sufficient contacts with the State of California to support the existence of personal jurisdiction in California over them.

4.     This action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et. seq.*, the Patent Laws of the United States 35 U.S.C. § 101, *et. seq.*, and under the laws of the State of California.

5.     This Court has jurisdiction pursuant to 35 U.S.C. § 1 *et seq.*, 35 U.S.C. § 292, 28 U.S.C. §§ 1331, 1332, 1338(a), 1338(b), 2201 and 2202, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  The Court has pendent jurisdiction of the California state law claim under 28 U.S.C. § 1338(b).

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## FACTS COMMON TO ALL ACOUNTS

7.     Plaintiff, Veracity, is a regionally renowned and industry recognized GPS fleet tracking company based in San Diego, California, providing real-time GPS tracking of fleet vehicles and personnel.

8.     Beginning as early as 2002, Veracity has and continues to develop, manufacture, and market GPS-based fleet management systems and services under the brand name FieldLogix. The products and services offered by Veracity have led to many industry awards and small business related accolades.

9.     Upon information and belief, Defendant is the owner by assignment of U.S. Patent No. 6,958,701 ("the '701 Patent") which issued on October 25, 2005 to John D. Storkamp, Mark A. Storkamp, and Ronald H. Menzhuber, entitled "Transportation Monitoring System for Detecting the Approach of a Specific Vehicle." A copy of the '701 Patent is attached hereto as Exhibit 1.

10. Upon information and belief, an inter partes review on the patentability of claims 1-2 and 4-17 of the '701 Patent was instituted on July 17, 2015 and is still currently proceeding in the Patent Trial and Appeals Board of the United States Patent and Trademark Office.

11. On July 17, 2015 the Patent Trial and Appeal Board entered an order, and attached hereto as Exhibit 2 (hereinafter referred to as "the IPR Decision"), that an inter partes review be instituted for Claims 1-2 and 4-17 of the '701 Patent because there is a reasonable likelihood that the Petitioner would prevail with respect to claims 1-2 and 4-17 of the '701 Patent.

12. On May 6, 2016, Veracity received a correspondence with attached documents from an entity identified as the Patent Licensing Alliance ("PLA") on behalf of Virtual Fleet Management, and attached hereto as Exhibit 3 (hereinafter referred to as "the PLA Letter").

13. Upon information and belief, PLA's principal place of business is at 5251 South Green St., Suite 350, Murray, Utah 84123.

14. The PLA Letter claimed that Veracity's FieldLogix GPS-based fleet management systems and services "employs the technology claimed and disclosed in United States Patent 6, 958,701."

15. The PLA Letter also stated that Virtual Fleet Management has "been enforcing its intellectual property rights," and that Virtual Fleet Management requires a license for use of its technology in order for possible infringers to avoid liability.

16. The PLA letter included a "Pre-Filing Investigation Claim Chart" alleging Veracity's FieldLogix GPS-based fleet management systems and services of infringing claims 10 and 14 of the '701 Patent.

17. On May 16, 2016, Veracity sent a first correspondence via e-mail to PLA in reply to the PLA Letter, and attached hereto as Exhibit 4 (hereinafter referred to as "the First Veracity Correspondence").

18. Virtual Fleet Management failed to respond to the First Veracity Correspondence.

19.     On July 19, 2016, Veracity sent a second correspondence via mail to PLA, and attached hereto as Exhibit 5 (hereinafter referred to as "the Second Veracity Correspondence").

20.     On July 27, 2016, Veracity received a correspondence by e-mail from a Joseph Pia from the law firm of Pia Anderson Dorius Reynard & Moss, and attached hereto as Exhibit 6 (hereinafter referred to as "the PIA Letter"), which states that, among other things, the law firm of Pia Anderson Dorius Reynard & Moss is the litigation counsel for Virtual Fleet Management and have and continue to bring suits with respect to the '701 Patent.

21.     On September 16, 2016, by telephone, a representative of PLA on behalf of Virtual Fleet Management spoke with Veracity regarding licensing of the '701 Patent to Veracity Wireless.

22.     The allegations in the PLA Letter and attached documents, the PIA Letter, and the various correspondence discussed herein imply or otherwise indicate that Virtual Fleet Management will sue Veracity for patent infringement if Veracity refuses to license the '701 Patent.

23.     Asserting the '701 Patent Virtual Fleet Management knew or should have known to be invalid and not infringed and essentially demanding that Veracity discontinue selling a product and service is unfair competition because it discourages the manufacture and sale of Veracity's FieldLogix GPS-based fleet management systems and services, a competitive product.  The statements are injurious to Veracity's relationships with its customers and injurious to Veracity's commercial reputation and therefore constitute Unfair Competition.

24.     Based upon the allegations by Virtual Fleet Management, and upon the prior exchange of correspondence, Virtual Fleet Management has purposefully availed itself of the privilege of doing business with residents and businesses in the State of California, Virtual Fleet Management has become subject to personal jurisdiction in this Court for this action for declaratory relief.

25.     Based upon the allegations by Virtual Fleet Management, and upon the prior exchange of correspondence, there is an actual controversy within the meaning of 28 U.S.C. § 2201 for purposes of this declaratory judgment action.  Veracity has an objectively reasonable

apprehension that it will face an infringement suit by Virtual Fleet Management regarding the '701 Patent, if Veracity continues to sell its accused products and services.

26.     Veracity has been harmed and will continue to be harmed if it is forced to proceed with its business without a clear declaration of its non-infringement and the invalidity of the '701 Patent owned by Virtual Fleet Management.  Potential damages will continue to accrue, and Veracity will thereby be subjected to uncertainty and insecurity.  As Veracity is anxious to resolve this dispute, it is filing this current action.


## FIRST CAUSE OF ACTION

### Declaratory Judgment re Non-Infringement of Virtual Fleet Management's 701 Patent

27.     Veracity hereby incorporates the allegations of Paragraphs 1 through 26 above as set forth and re-alleges them in full herein.

28.     Veracity's FieldLogix GPS-based fleet management systems and services each alone or in any combination, have not and do not infringe claims 10 and 14 of the '701 patent, directly or indirectly, either literally or under the doctrine of equivalents under Federal Law.

29.     Veracity's FieldLogix GPS-based fleet management systems and services, each alone or in any combination, have not and do not infringe the '701 Patent as hereinabove alleged, under 35 U.S.C. § 271 for reasons, including the reason that the '701 Patent patents do not incorporate any claims directed to protectable features.

30.     Veracity is entitled to a judgment declaring that its products and services do not infringe Virtual Fleet Management's '701 Patent.

## SECOND CAUSE OF ACTION

### Declaratory Judgment re Invalidity of the Claims of the '701 Patent

31.     Veracity hereby incorporates the allegations of Paragraphs 1 through 30 above as if set forth and re-alleged in full herein.

32.     One or more claims of the '701 Patent are invalid for failure to satisfy the statutory criteria for patentability under 35 U.S.C. § 101, *et seq.*, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, and 119.

33.     One or more claims of the '701 Patent are invalid under 35 U.S.C. §§ 102 and 103 over at least the following prior art references, alone or in combination: United States Patent No. 4,775,865 to Smith et al.; United States Patent No. 5,311,172 to Sadamori; United States Patent No. 5,613,216 to Galler; United States Patent No. 5,629,689 to Curwood; United States Patent No. 6,700,506 to Winkler et al.; United States Patent No. 6,714,142 to Porter et al.; WIPO Publication No. 93/13503 to Dulaney et al.; and United Sates Patent No. 6,636,160 to Brei.

## THIRD CAUSE OF ACTION

Unfair Competition and Unfair Trade Practices

34.     Veracity hereby incorporates the allegations of Paragraphs 1 through 33 above as if set forth and re-alleged in full herein.

35.     Veracity's conduct is alleging and implying that Veracity infringes Virtual Fleet Management's '701 Patent, as set forth in the PLA Letter, constitutes unfair competition and unfair trade practices in violation of California Business and Professions Code Section 17200 *et seq*., which is demonstrably untrue and Virtual Fleet Management knows or should have known that the statements were untrue.  There is a strong public interest in protecting Veracity from Virtual Fleet Management's unfair competition and unfair trade practices.

36.     Veracity is entitled to recover any and all damages permitted under California Business and Professions Code Section 17200 *et seq*., including attorney's fees, punitive damages, and costs from Veracity for Virtual Fleet Management's willful, knowing misconduct as well as injunctive relief against Virtual Fleet Management's continued unfair competition and unfair trade practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Veracity prays that this Court enter judgment as follows:

(a)     Declaring that Veracity's FieldLogix GPS-based fleet management systems and services do not infringe any claim of the '701 Patent under 35 U.S.C. § 271;

(b)     Declaring that the '701 Patent is invalid;

(c)     Declaring that the sale and offer for sale of Veracity's products and services do not constitute unfair competition under Federal law;

(d)     Declaring that Virtual Fleet Management's conduct constitutes unfair competition and unfair trade practices in violation of California Business and Professions Code Section 17200 *et seq.*;

(e)     Granting preliminary and permanent injunctions to stop Defendants' threats and unfair competition and trade practices;

(f)     Awarding Veracity its actual damages to be proven at trial;

(g)     Declaring this to be an exceptional case and awarding Veracity its reasonable attorney's fees under 35 U.S.C. § 285;

(h)     Awarding Veracity its reasonable attorney's fees under California Business and Professions Code Section 17200 *et seq.*; and

(i)     Granting Veracity such other further equitable and legal relief as the Court may deem proper.

Respectfully submitted,

Dated: February 14, 2017

Eastman & McCartney LLP

By: /s/  Gary L. Eastman

Gary L. Eastman, Esq.

Attorney for Plaintiff

COMPLAINT FOR DECLARATORY RELIEF re: (1) Non Patent Infringement; (2) Invalidity of Patent; and (3) Unfair Competition Under State Law

7

## <u>REQUEST FOR JURY TRIAL</u>

Pursuant to F.R.Civ. P. 38(b) and Southern District Civil Local Rule 38.1, Plaintiff Veracity hereby demands its right to a jury trial on all issues triable to a jury.

Dated: February 14, 2017

Eastman & McCartney LLP

By: <u>/s/  Gary L. Eastman</u>

Gary L. Eastman, Esq.

Attorney for Plaintiff

COMPLAINT FOR DECLARATORY RELIEF re: (1) Non Patent Infringement; (2) Invalidity of Patent; and (3) Unfair Competition Under State Law

8



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 1

COMPLAINT FOR DECLARATORY RELIEF re: (1) Non Patent Infringement; (2) Invalidity of Patent; and (3) Unfair Competition Under State Law

9



US006958701B1

(12) **United States Patent**
Storkamp et al.

(10) Patent No.: **US 6,958,701 B1**
(45) Date of Patent: **Oct. 25, 2005**

(54) **TRANSPORTATION MONITORING SYSTEM FOR DETECTING THE APPROACH OF A SPECIFIC VEHICLE**

(76) Inventors: **John D. Storkamp**, 1713 Highland Trail, St. Cloud, Stearns, MN (US) 56301; **Mark A. Storkamp**, 917 13th Ave. South, St. Cloud, Stearns, MN (US) 56301; **Ronald H. Menzhuber**, 3078 16th St. NW., New Brighton, MN (US) 55112

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 44 days.

(21) Appl. No.: **10/454,903**

(22) Filed: **Jun. 4, 2003**

**Related U.S. Application Data**

(60) Provisional application No. 60/385,741, filed on Jun. 5, 2002.

(51) **Int. Cl.7** ............................................. **G08G 1/123**
(52) **U.S. Cl.** ...................... **340/794**; 340/992; 340/993; 701/207; 246/122 R
(58) **Field of Search** ................................ 340/994, 944, 340/426.13, 426.17, 426.35, 426.36, 992, 340/993; 701/207; 246/122 R

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,568,161 A | * | 3/1971 | Knickel ...................... 340/992 |
| 4,297,672 A | | 10/1981 | Fruchey et al. |
| 4,325,057 A | * | 4/1982 | Bishop ....................... 340/994 |
| 4,350,969 A | | 9/1982 | Greer |
| 4,713,661 A | | 12/1987 | Boone et al. |
| 5,021,780 A | | 6/1991 | Fabiano et al. |
| 5,144,301 A | | 9/1992 | Jackson et al. |
| 5,150,310 A | * | 9/1992 | Greenspun et al. ......... 342/451 |

| | | | |
|---|---|---|---|
| 5,400,020 A | | 3/1995 | Jones et al. |
| 5,483,234 A | * | 1/1996 | Carreel et al. .............. 340/994 |
| 5,483,454 A | * | 1/1996 | Lewiner et al. ............. 701/200 |
| 5,493,295 A | * | 2/1996 | Lewiner et al. ............. 340/994 |
| 5,623,260 A | | 4/1997 | Jones |
| 5,657,010 A | | 8/1997 | Jones |
| 5,680,119 A | | 10/1997 | Magliari et al. |
| 5,736,940 A | * | 4/1998 | Burgener ................... 340/994 |
| 5,739,774 A | * | 4/1998 | Olandesi ................... 340/994 |
| 5,774,072 A | | 6/1998 | Wu |
| 6,006,159 A | * | 12/1999 | Schmier et al. ............. 701/200 |
| 6,184,802 B1 | | 2/2001 | Lamb |
| 6,191,708 B1 | | 2/2001 | Davidson |
| 6,313,760 B1 | | 11/2001 | Jones |
| 6,317,060 B1 | | 11/2001 | Jones |
| 6,459,989 B1 | * | 10/2002 | Kirkpatrick et al. ........ 701/215 |
| 6,636,160 B2 | * | 10/2003 | Brei ........................... 340/994 |

* cited by examiner

*Primary Examiner*—Daniel Wu
*Assistant Examiner*—Samuel J. Walk
(74) *Attorney, Agent, or Firm*—Albert W. Watkins

(57) **ABSTRACT**

A system and apparatus for detecting the approach of a vehicle includes an encoded signal which identifies a vehicle or route, and which is used to distinguish from different vehicles and routes. A receiver detects transmission signals above a threshold level, and responsive to reception thereof checks for one or a plurality of codes that identify particular vehicles of interest. When a desired signal is received, an alarm or indicator is generated that alerts a person. When the indicator is terminated, a lock-out period prevents undesired re-activation of the alarm or indicator based upon the same code. Unique headers enable transmission and exchange of additional data, and logical text may be provided which enables more ready viewing of coded information. The present invention has industrial applicability to public and private transportation systems, whether for passengers or other cargo.

**18 Claims, 3 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3

# TRANSPORTATION MONITORING SYSTEM FOR DETECTING THE APPROACH OF A SPECIFIC VEHICLE

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims priority to U.S. provisional application Ser. No. 60/385,741 filed Jun. 5, 2002 and abandoned herewith, the contents which are incorporated herein by reference in entirety.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention pertains generally to electrical communications, and more specifically to vehicle position indicators that signal a vehicle's anticipated arrival. In one more specific manifestation, the indicators are for school buses or other similar public transportation, though other manifestations are also described.

### 2. Description of the Related Art

Many different modes of transportation exist that utilize an operator, such as a driver, engineer or other ones of the myriad of names provided for such persons, and a vehicle to transport one or more passengers from one location to another. Operator-controlled transportation brings many universally recognized benefits. Among them are the conservation of energy, which is particularly beneficial in such instances as buses, light and heavy rail and the like. These mass transit systems also preserve real-estate by carrying many passengers in a single line in an efficient manner, while not requiring any associated automobile parking space. Where parking may be limited or completely unavailable, such as is common in larger cities or in special locations or facilities, such types of transportation may be the only viable mode of travel. Finally, in the cases of more private methods such as taxi cabs and the like, transportation is frequently made available where it would have otherwise not been possible or practical.

Nevertheless, operator-controlled transportation has, in many cases, garnered a reputation as eing somewhat less convenient than personal transportation for most ordinary trips. This is because the passenger must be at a pick-up location and ready for boarding well in advance of the anticipated arrival of the vehicle. This adds additional time to the trip, and also exposes the passenger to the vagaries of the environment. Such early arrival is necessitated since many of these vehicles will have a slightly variable arrival and departure time, and these vehicles will preferably not wait at any stops. Waiting at a stop would undesirably prolong the trip made by the vehicle, which would only add to the travel time and consequent inconvenience of this type of transportation for all passengers. Furthermore, the additional time to travel a route will also necessitates additional billing to compensate the operator, and reduce the availability of the vehicle for covering either the same or other routes. This is particularly true in the instance of more private modes of transportation, such as taxi cabs or the like, where wait times may be directly billed to the passenger.

Beyond inconvenience and minor added expense, and for many passengers an issue of greatest paramount, is the issue of safety. There are many locations where public transportation must be provided but cannot economically be provided with adequate security to ensure the safety of all passengers. One particular instance is the bus stop, which often serves as the gathering point for many diverse persons.

All too often, these persons are for one reason or another more vulnerable than most. One particular instance is that of a school bus stop, where very young or small children must gather and wait for the school bus or where they will be dropped a the end of the school day. Unfortunately, these bus stops are scattered all about the country-side, from street corners to rural locations. Since the only persons traveling are school aged children, and since in many school districts transportation may be provided at different times for different age groups, it is entirely possible for kindergarten or elementary school children to be the only passengers at a stop. Further compounding the matter, at some times of the year and in some localities, the pick-up or drop-off times will be outside of daylight. While many times it is possible for the districts to avoid such scheduling, there are still some instances where this occurs. During these times, the young children are very vulnerable. Even with adults, a single or few passengers may be vulnerable and consequently unsafe.

In order to improve the safety and convenience of operator-controlled transportation systems, a number of systems have been developed which notify a passenger of an impending arrival of a vehicle. These systems are desirable since the transit time may be reduced, by reducing the amount of waiting at a pick-up or vehicle stop. Safety is improved, since the passenger is exposed for less time, and the vagaries of the environment, such as rain or the like, are somewhat less consequential. Where an individual will be picked up at their residence, or nearby, such systems provide ample advance notice for the passenger to be ready just as the vehicle arrives. This improves the efficiency and safety of the transit system for all.

Exemplary of the prior art systems, and each incorporated herein by reference for their specific teachings, are U.S. Pat. No. 5,021,780 to Fabiano et al; U.S. Pat. No. 4,325,057 to Bishop; U.S. Pat. No. 4,297,672 to Fruchey et al; U.S. Pat. No. 4,713,661 to Boone et al; U.S. Pat. No. 6,191,708 to Davidson; U.S. Pat. No. 4,350,969 to Greer; U.S. Pat. No. 5,144,301 to Jackson et al; U.S. Pat. No. 5,400,020 to Jones et al; U.S. Pat. No. 5,680,119 to Magliari et al; and U.S. Pat. No. 6,184,802 to Lamb. The patents of the prior art may somewhat generally be grouped according to the techniques which are provided to enable advance notice. One approach, illustrated by Jackson et al, is to use a low-power transmitter which triggers an audible or visual signal when close enough to a receiver. This technique requires very little capital cost, and may therefore be implemented readily by many transit systems and providers. However, there are few available unique frequencies in the radio spectrum, and interfering signals can cause the receiver to falsely trigger. In areas where several transportation vehicles will simultaneously operate, it can be extremely difficult to avoid triggering from the wrong vehicle. Such false alerts render the system relatively ineffective for all but the most rural of routes.

One approach which avoids the false triggering is illustrated, for exemplary purposes, by Jones et al. Using this system, a transportation vehicle is provided with relatively advanced electronics that may, for example, employ position detection systems such as GPS, Loran or the like, together with various sensors to detect the status of the transit vehicle. The transit vehicle may then be monitored for movement, and an arrival schedule predicted with some reliability. Passengers then subscribe to the system provider, who may use an automated dialing system with unique ring to notify the passengers at the appropriate time that the transit vehicle is approaching. For systems with fewer subscribers, this type of system offers several advantages. First of all, the location and status of each transit vehicle

may be monitored very accurately. The relatively high capital cost of the equipment is limited to the transit vehicles, and not further multiplied by any passenger equipment. Unfortunately, when volumes of passengers increase, the amount of time required for timely notification also increases. Said another way, while everything is conveniently centralized, the load upon the central system may increase to a level which is greater than that which may be managed. Consequently, as the numbers of subscribing passengers increase, the system becomes substantially more expensive and more difficult to operate and maintain.

In all of these prior art systems, there is little in the way of flexibility provided to the subscriber, beyond how much advance notice the subscriber wishes to receive. Consequently, these systems are optimized for mass transit systems which are simply announcing the anticipated arrival of the transit vehicle at a particular stop.

## SUMMARY OF THE INVENTION

In a first manifestation, the invention is a system for detecting the approach of a vehicle. Within the system, a vehicle transmitter operatively transmits at least one code. A code generator generates a representative code selected from a plurality of codes which is representative of the vehicle transmitter and discernable from others of the plurality of codes. The code generator is operatively coupled to the vehicle transmitter, to thereby couple the representative code to vehicle transmitter for transmission of a signal therefrom. A receiver remote from the vehicle transmitter has a signal receiver operatively monitoring for transmitted signals at a signal strength of at least a first threshold. A code demodulator responds to the signal receiver and extracts representative code from such a signal. A code detector compares the representative code to at least one user-selected code and generates an indication of identity therewith.

In a second manifestation, the invention is a means for alerting a person to a location of a transmitter at a first instant of time. The alerting means has a transmitter, and also a receiver spatially disparate to the transmitter. Both transmitter and receiver are tuned to a common transmission signal. A threshold of the common transmission signal is detectable by the receiver, and a code carried by the common transmission signal identifying the transmitter is also detectable by the receiver. A means within the receiver is provided for comparing the code to stored values and responsive to a match therewith generating a signal indicative of a match.

## OBJECTS OF THE INVENTION

Exemplary embodiments of the present invention solve inadequacies of the prior art by providing an amplitude activated, code controlled receiver which uses unique headers that enable special communications and functions between transmitter and receiver. The receiver is also preferably provided with an ability to lock out the receiver for a particular interval to prevent undesirable re-triggering by the same vehicle, and to be able to trigger on and identify more than one transit vehicle at a time. Where necessitated, RF collision detection and avoidance may also be incorporated.

A first object of the invention is to provide an enhanced transportation monitoring and alerting system. A second object of the invention is to provide the enhancements using a combination of existing low-cost and proven approaches, integrated with several novel key features that greatly increase the flexibility and utility of the present invention

over that of the prior art without driving the costs to socio-economically unacceptable levels. Another object of the present invention is to enable very high volumes of users, both transmitters and receivers, without conflict or false signaling. A further object of the invention is to enable simultaneous monitoring of more than one transit vehicle. Yet another object of the present invention is to enable system upgrades without requiring replacement or retooling of existing capital equipment. A further object of the invention is the enabling of a lock-out, which permits one monitored channel to be disabled or locked out for a predetermined time period. Another object of the invention is to enable capacity for data transmission or exchange through the use of unique codes and headers.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other objects, advantages, and novel features of the present invention can be understood and appreciated by reference to the following detailed description of the invention, taken in conjunction with the accompanying drawings, in which:

FIG. 1 schematically illustrates a preferred system for detecting the approach of a specific vehicle designed in accord with the teachings of the present invention.

FIG. 2 illustrates a preferred transmitter and receiver pair used in the preferred system of FIG. 1 by block diagram.

FIG. 3 illustrates a preferred coding technique.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Manifested in the preferred system 10 for detecting the approach of a vehicle 15, the present invention provides a relatively low-powered vehicle-carried transmitter unit 100. The particular power level which may be required will depend upon the size of the route traveled, relative spacing between intended stops and the like, though for the purposes of illustration only and not limiting thereto, in the preferred embodiment a transmitter operating at approximately 433 Mhz may be powered for short burst transmissions at a peak power level that will typically be within a range of 100 milliwatts and 5 Watts. Those skilled in the art will understand that this power level will also be dependent upon the sensitivity of receivers 200 that transmitter 100 is being used in association with. For many urban or suburban applications, a range of only a few city blocks may be adequate for providing the intended notice, though much greater distances maybe desired, depending upon the most desirable lead times and size of the overall route. In other words, for a route which only encompasses a few block radius, transmitter power levels may be decreased and/or receiver sensitivity decreased such that receivers such as receiver 200 will not be continuously activated. For rural routes that span many miles, much higher transmitter power levels and receiver sensitivities will produce greater advance notice.

While a bus is illustrated in FIG. 1 as the preferred transit vehicle 15, any other types of transit vehicles will be understood to be included, as described herein above and in the references incorporated herein by reference. Consequently, thoroughfare 20 may be a road, river, or even air in the case of an airplane. Transit vehicle 15 will be understood to be any type of vehicle which is designed for carrying a passenger 40. Furthermore, transit vehicle 15 will also be understood to encompass other types of vehicles that are instead be provided for such industry as the transport of packages or for other application.

Passenger **40** will most preferably be located within audible or visual range of receiver **200**, such as within a shelter **30**. Shelter **30** may include a house, apartment or other dwelling, but is not limited thereto. In fact, receiver **200** may be designed to be portable and bodily-carried by passenger **40**, if so desired. Nevertheless, for many typical applications, it is anticipated that shelter **30** may be a dwelling. Transmitter **100** will generate a signal such as radio waves **17**, which at some finite distance will be within range of reception of receiver **200**. This will in turn trigger receiver **200** to notify passenger **40**. The method of notification in preferred system **10** is a combination of sound and light, and may be switched therebetween to signal different distances. In other words, a first visual alarm may be triggered, followed by a subsequent audible alarm as the transit vehicle **15** gets sufficiently closer to cross another threshold. Most preferably, the notification will be sufficiently advanced to permit passenger **40** to reach boarding site **25** at the same time or just slightly before transit vehicle **15**. In one method conceived herein, the invention will have application to persons affiliated with the passenger, such as parents or guardians who will be meeting their child at a bus stop, or care-givers who may be similarly expecting a person under their care to arrive. Using the preferred system **10**, both the passenger **40** and a guardian or care-giver may obtain advance notification.

FIG. **2** illustrates the most preferred transmitter **100** and receiver **200** by block diagram. Those skilled in the art of electrical communications will recognize that the internal components are preferred, but that there will be many known alternatives to each of the more basic components found therein. Transmitter **100** includes a power source **140**, which in the preferred embodiment illustrated in FIG. **2** is the vehicle battery. Most vehicle power is fraught with noise and interfering spikes, and will frequently be of the wrong amplitude. Consequently, a power regulator **150** will be provided to ensure the appropriate potential and to protect against damaging spikes or noise. Microprocessor **120** will most preferably not only include the microprocessor chip, but all necessary associated components, which is known to depend upon the specific microprocessor. For example, crystal oscillators, resistors, filter capacitors, memory including volatile, non-volatile, magnetic and other known types, and any of a multitude of other components are known to be used in association with the microprocessor chip, and are understood to be include herewith. A means or method for selecting a particular unique identification will most preferably be provided to transmitter **100**, and, in the preferred embodiment of FIG. **2**, that method is through the inclusion of thumbwheel selector switches **110**. These switches may frequently be Binary-Coded Decimal (BCD) switches, which for each switch will reproduce in binary digital form a representation of from zero to nine. Just one of these BCD switches would allow the transmitter ten different unique identifications, while two would allow **100**, and so forth in powers of ten. Other means for selecting this code may be used as desired, including but not limited to keypads, other coded switches, keys or even received codes from another transmitter, to name just a few of the many possibilities.

Microprocessor **120** in preferred transmitter **100** will use selector switches **110** or other equivalent means to generate a unique transmitter code that uniquely identifies vehicle **15**. Most preferably, the unique transmitter code will be generated immediately upon the application of power from vehicle battery **140**, using appropriate programming of microprocessor **220**, and, in such instance, power regulator

**150** will desirably be connected through a key or ignition switch or the like. The transmitter code will be continuously or periodically conducted from microprocessor **120** to RF generator **130** for appropriate amplification, modulation and the like to boost the code to both Radio Frequency (RF) and sufficient power levels as described herein above. In the preferred embodiment, Manchester encoding is used together with a data transmission rate of 2400 baud. Microprocessor **120** will simply turn RF generator **130** on and off at the appropriate times. Given the foregoing data transmission rate, about 22 milliseconds are required to transmit the desired five bytes. Similar to other components, RF generator **130** may also take the form of an integrated circuit and all associated components, as this will simplify the construction, lower manufacturing costs, and provide similar benefits as are known in the art. The amplified RF signal is then transmitted through antenna **160** to produce radio waves **17** illustrated in FIG. **1**.

In the preferred embodiment, microprocessor **120** will be programmed so that when selector switches **110** are set to a total value of zero, or, in the case of two or more BCD switches, each switch set to zero, microprocessor **120** will not communicate a code to RF generator **130**, and will preferably disable transmission therefrom. In the preferred embodiment, microprocessor **120** will also selectively provide power to each one of the switches, when two or more are used. In such case, the outputs from each switch may be passed through blocking diodes, to permit microprocessor **120** to individually poll each switch and thereby reduce the numbers of input lines required into microprocessor **120**.

A preferred message assembled by microprocessor **120** will include five bytes of data. The hex representation of the message will preferably be as follows:

| | |
|---|---|
| 41 | fixed header |
| 03 | remaining byte count |
| 0X | switch value |
| YZ | switch value |
| CC | checksum for the entire message |

To each byte of data, the microprocessor will preferably add a start bit and a stop bit. X, Y and Z represent the values that appear in selector switches **110**, assuming three BCD switches, while the checksum CC allows receiver **200** to verify the integrity of the received message.

While radio waves are used in the preferred embodiment, other techniques of electrical communication through the ether are contemplated herein as well, and may include such techniques as directional microwave transmission, optical transmission including infra-red and laser techniques, or other diverse means and method. Distance-dependent transmission in the preferred embodiment provides a natural and low-cost method for establishing a threshold distance for triggering the receiver.

Receiver **200** in the preferred embodiment includes an antenna **260** and RF demodulator **230**. RF demodulator **230** may be a single chip integrated circuit, or may include a variety of sections and stages including the various known heterodyning and demodulation techniques known in the art. Further, RF demodulator **230** does not have to include frequency shifting or demodulation, depending upon the nature of the signal being transmitted from transmitter **100**. The output from RF demodulator **23** is conveyed in the form of a digital signal or word to microprocessor **220** for further processing.

Microprocessor **220** receives various human input through selection bank **210**, which, in the preferred embodiment, includes mode control **212**, a rotary selector knob **214**, and a quiet control **216**. These inputs are in the preferred embodiment achieved using interrupt processing, well known and documented in the field of microprocessors. In the preferred embodiment, mode control **212** and quiet control **216** may be implemented as simple switches. The human-understandable output is provided through display **270** and audio alarm **280**, both which are well-known and understood in the field of microprocessors. In the preferred embodiment, display **270** will be implemented as an LCD display, though the myriad of display devices, including interactive devices such as touch screens and the like, are contemplated herein. Power supply **240** may simply be a wall outlet converter, though batteries or battery back-up and the like are contemplated herein.

In operation in accord with the preferred embodiment, microprocessor **220** is programmed for four modes of operations, including 'RECEIVE', 'SET CHANNEL', 'SET CODE', AND 'ENABLE/DISABLE'. The current operating mode may be indicated in display **270** and controlled through mode control input **212**. Activating mode control input **212**, which in the preferred embodiment is implemented by simply pressing a switch button, will cycle through each of the operating modes. Receiver **200** is not limited to these four modes of operation, and may include fewer or more modes as required for a particular application.

The normal mode, and preferably the one activated upon start-up, is the 'RECEIVE' mode. In this state, receiver **200** is waiting for appropriated coded transmissions from a nearby transmitter. If such a transmission is detected, which consists of RF demodulator **230** detecting an appropriate signal, an interrupt is sent to microprocessor **220**. This will cause microprocessor **220** to attempt to decode the data, based on the previous settings and internal timers. Manchester encoding of the preferred five byte message allows receiver microcode to synchronize with the transmitted message. If the decoded signal is one which was previously selected for monitoring, microprocessor **220** will activate audio alarm **280**.

When a person no longer wants to hear the alarm, 'QUIET' control **216** may be pressed to deactivate alarm **280** for the particular vehicle unique identification code. In the preferred embodiment, the 'QUIET' control will automatically disable activation on that code for thirty minutes.

Due to the routes which are often required to pick up all of the intended passengers, a transit vehicle **15** may often be forced to serpentine through a region. This serpentine pattern will cause prior art distance-based systems to falsely activate each time transit vehicle **15** gets close to receiver **200**. In other words, receiver **200** will not only trigger the first time vehicle **15** gets within reception range, but will again trigger each time thereafter. The present invention overcomes this limitation by using microprocessor **220** through programming to nullify the active alarm, and provide a lock-out for a pre-determined or programmable time period. In the most preferred embodiment, this time period has been selected to be one-half of an hour, though those skilled in the art will understand that this time period may be of different duration or may be user-determined, depending upon the cost and complexity deemed acceptable or desirable for receiver **200**.

Before detecting a transit vehicle **15**, receiver **200** must first be directed to desired codes to receive. In other words, receiver **200** has the capability for receiving and correctly identifying a large number of transit vehicle codes. How-

ever, at any given time, only one or a select few codes will be of any interest to a particular passenger. Consequently, these particular codes need selected. In the preferred embodiment, this is accomplished using the 'SET CHANNEL' mode. Turning rotary knob **214** will scroll through the available channel numbers. These channel numbers represent the available quantity of codes that can be monitored at a given time. In other words, if receiver **200** is capable of monitoring for a total of eight different unique codes, then there will be eight available channels. Once a channel is selected, then the mode button is pressed to select 'SET CODE'. Once again, rotary knob **214** is turned until the desired transit vehicle code is selected. Contemplated herein is the ability to either display this data in code form, or to provide intelligent interpretation of the code for the application. This might, for exemplary purposes only and not limited thereto, take the form of logical text being displayed for the corresponding route. For example, the code may be 531, but that might represent the "downtown" city bus. Rather than displaying "531", "downtown" or other similar more descriptive text, hereinafter referred to as logical text which conveys either through words or abbreviations recognizable meaning, may alternatively be displayed, once again depending upon the complexity and pricing desired for receiver **200** and system **10**.

When the desired code is displayed, activating mode control **212** once again until 'RECEIVE' is displayed will select the particular code. The foregoing procedure may be used to set transit vehicle codes for as many channels as are available. In the preferred embodiment, there are eight channels, though more or less may readily be implemented in light of the present disclosure.

At some point, a person may want to temporarily disable detection of a specific vehicle code. To do this, one first puts receiver **200** in the 'SET CHANNEL' mode, turns rotary knob **214** to select the desired channel, pressing the mode button to put receiver **200** in 'ENABLE/DISABLE' mode, and finally turning rotary knob **214** to change the status to either enable or disable status. To return to normal operation, a person must only activate mode control **212** until receiver **200** is again in 'RECEIVE' mode.

A sample Manchester code is illustrated in FIG. **3**. This code, as aforementioned, permits internal synchronization. The code suppresses dc and low-frequency signal components.

The use of the five byte word of the present invention permits additional novel flexibility. More particularly, herein above the hex representation **41** designates a fixed header. This header may be altered for different purpose, which permits a wide range of transmitted and received functions. For example, a unique header may be selected that designates a message corresponding to the current time and date. Use of this header will cause all receivers within range to time synchronize. Bus codes and route information may be transmitted to each receiver using a different header code value. So, for example, the bus ID "531" referenced above that corresponds to "downtown" may be set or changed through transmitted information using the unique header. Text messages may be similarly sent, and special configuration information or reprogramming may similarly be transmitted. One particularly beneficial feature contemplated herein, though somewhat more expensive, is the ability to equip both vehicles and passengers with full transceivers, each including hardware similar to both transmitter **100** and receiver **200**. In such instance, it would be possible to transmit text both to and from the transit vehicle **15**. In some cases, such as school bus routes where the passenger will not

be taking the bus, the bus may then be alerted without having to stop and wait for any passenger. In the case of commercial delivery services, it is commonplace for a courier to be obligated to stop at each major customer for pick-up, regardless of whether any packages are to be dropped off or picked up. Using the capability of the present unique headers and bi-directional communication, such unwarranted courier stops may be avoided.

While the foregoing details what is felt to be the preferred embodiment of the invention, no material limitations to the scope of the claimed invention are intended. Further, features and design alternatives that would be obvious to one of ordinary skill in the art are considered to be incorporated herein. For example, the numbers and possibilities for the type of modulation are nearly limitless, including Amplitude Modulation, Frequency Modulation, Frequency Shift Keying, Phase-Shift Keying, spread-spectrum, and the myriad of other techniques. The operating frequencies are equally as variable, dependent upon the desired transmission characteristics, power and range, as well as available spectrum for the present use. Other similar variables too numerous to specifically mention are considered incorporated herein. Consequently, the scope of the invention is set forth and particularly described in the claims hereinbelow.

We claim:

1. A system for detecting the approach of a vehicle, comprising:

a vehicle transmitter which operatively transmits at least one code beyond said vehicle transmitter;

a code generator that generates a representative code selected from a plurality of codes which is representative of said vehicle transmitter and discernable from others of said plurality of codes, said code generator operatively coupled to said vehicle transmitter to couple said representative code to said vehicle transmitter for transmission of a signal therefrom;

a receiver remote from said vehicle transmitter having a signal receiver operatively monitoring transmitted signals from said vehicle transmitter at a signal strength at said receiver of at least a first threshold and having a code demodulator responsive to said signal receiver extracting said representative code from said signal;

a code detector comparing said representative code to at least one user-selected code and generating an indication of identity therewith; and

a lock-out for preventing said generation of indication of identity with said at least one user-selected code.

2. The system for detecting the approach of a vehicle of claim 1 wherein said representative code further comprises a code which uniquely identifies said vehicle transmitter.

3. The system for detecting the approach of a vehicle of claim 2 wherein said uniquely identifying code is transmitted using Manchester coding.

4. The system for detecting the approach of a vehicle of claim 1 wherein said code detector further comprises comparing said representative code to a plurality of user-selected codes and generating an indication of identity with any of said plurality of user-selected codes.

5. The system for detecting the approach of a vehicle of claim 1 wherein said code generator further generates a header within said at least one code.

6. The system for detecting the approach of a vehicle of claim 5 wherein said header further comprises a unique code to set synchronizing said receiver with said vehicle transmitter with respect to at least one data field.

7. The system for detecting the approach of a vehicle of claim 6 wherein said at least one data field further comprises date.

8. The system for detecting the approach of a vehicle of claim 6 wherein said at least one data field further comprises logical text associated with said representative code.

9. The system for detecting the approach of a vehicle of claim 6 wherein said at least one data field further comprises system configuration data.

10. A means for alerting a person to a proximity of a transmitter at a first instant of time, comprising:

a transmitter and a receiver spatially disparate to said transmitter, said transmitter and receiver tuned to a common transmission signal;

a threshold of said common transmission signal detectable by said receiver;

a code carried by said common transmission signal identifying said transmitter and detectable by said receiver;

a means within said receiver for comparing said code to a plurality of stored values and responsive to a match therewith generating a signal indicative of a match; and

a means to prevent at least one of said plurality of stored values from being included in said match signal generating.

11. The means for alerting a person to a proximity of a transmitter of claim 10, wherein said transmitter further comprises a transit vehicle.

12. The means for alerting a person to a proximity of a transmitter of claim 11, wherein said person further comprises a potential passenger.

13. The means for alerting a person to a proximity of a transmitter of claim 10, further comprising a means for detecting the elapse of a time interval, and, responsive thereto, disabling said preventing means.

14. The means for alerting a person to a proximity of a transmitter of claim 10, wherein said code uniquely identifies said transmitter.

15. The means for alerting a person to a proximity of a transmitter of claim 10, wherein said code further comprises an identification of said transmitter, and further comprises a header which identifies an application of said message data.

16. The means for alerting a person to a proximity of a transmitter of claim 10, wherein said transmitter starts transmitting said common transmission signal upon energization thereof and said receiver starts receiving said common transmission signal upon energization thereof.

17. The means for alerting a person to a proximity of a transmitter of claim 10, further comprising a means for detecting a transmission collision and re-transmitting said common transmission signal responsive thereto.

18. A system for detecting the approach of a vehicle, comprising:

a vehicle transmitter which operatively transmits at least one code beyond said vehicle transmitter;

a code generator that generates a representative code selected from a plurality of codes which is representative of and uniquely identifies said vehicle transmitter and is discernable from others of said plurality of codes, said code generator operatively coupled to said vehicle transmitter to couple said representative code to

said vehicle transmitter for transmission of a Manchester coded signal therefrom;

a receiver remote from said vehicle transmitter having a signal receiver operatively monitoring transmitted signals from said vehicle transmitter at a signal strength at said receiver of at least a first threshold and having a code demodulator responsive to said signal receiver extracting said representative code from said signal; and

a code detector comparing said representative code to a plurality of user-selected codes and generating an indication of identity with any of said plurality of user-selected codes; and

a lock-out for preventing said indication of identity with at least one of said plurality of user-selected codes for a first time interval.

\* \* \* \* \*

EXHIBIT 2

COMPLAINT FOR DECLARATORY RELIEF re: (1) Non Patent Infringement; (2) Invalidity of Patent; and (3) Unfair Competition Under State Law

10

PARTIES AND BOARD ONLY

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

MERCEDES-BENZ USA, LLC,
DAIMLER NORTH AMERICA CORPORATION, and
DAIMLER AG,
Petitioner,

v.

PROXIMITY MONITORING INNOVATIONS LLC,
Patent Owner.

_____

Case IPR2015-00397
Patent 6,958,701 B1

_____

Before MICHAEL W. KIM, TRENTON A. WARD, and
JASON J. CHUNG, *Administrative Patent Judges.*

WARD, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

# I. INTRODUCTION

## A. Background

Mercedes-Benz USA, LLC, Daimler North America Corporation, and Daimler AG (collectively "Petitioner") filed a Petition seeking to institute an *inter partes* review of claims 1–2 and 4–17 ("the challenged claims") of U.S. Patent No. 6,958,701 B1 (Ex. 1001, "the '701 patent") pursuant to 35 U.S.C. §§ 311–319. Paper 1 ("Pet."). Proximity Monitoring Innovations LLC ("Patent Owner") filed a Preliminary Response. Paper 12 ("Prelim. Resp."). We have jurisdiction under 35 U.S.C. § 314(a), which provides that an *inter partes* review may not be instituted "unless . . . there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."

Upon consideration of the Petition, Patent Owner's Preliminary Response, and the associated evidence, we conclude Petitioner has established a reasonable likelihood it would prevail with respect to at least one of the challenged claims. Accordingly, for the reasons that follow, we institute an *inter partes* review.

## B. Additional Proceedings

Petitioner informs us that the '701 patent has been asserted in the following cases: *Proximity Monitoring Innovations LLC v. AssetWorks, Inc.*, No. 1.14-cv-0575 (D. Del.); *Proximity Monitoring Innovations LLC v. Mercedes-Benz USA, LLC*, No. 1.14-cv-0576 (D. Del.); *Proximity Monitoring Innovations LLC v. Voxx Elecs. Corp. .*, No. 1.14-cv-0577, (D. Del.). Pet. 3; Paper 4, 2.

2

C. *Real Parties-In-Interest*

The America Invents Act ("AIA") is unequivocal: a petition for *inter partes* review "may be considered *only if*" it identifies all real parties-in-interest. 35 U.S.C. § 312(a)(2) (emphasis added). This identification must be made as part of a petitioner's mandatory notices, required to be filed as a part of the petition. 37 C.F.R. § 42.8(a)(1). Otherwise, we have held that correcting the identification of a real party-in-interest ("RPI") listed in a petition results in a loss of the petition's filing date, with a new filing date assigned as of the date the RPI identification is corrected. *See Askeladden LLC v. McGhie*, Case IPR2015-00122, slip op. at 15 (PTAB Mar. 6, 2015) (Paper 30). On March 20, we entered an Order on Motion to Amend the Mandatory Notice authorizing Mercedes-Benz USA, LLC ("Mercedes-Benz") to submit an amended mandatory notice to identify Daimler North America Corporation and Daimler AG as additional real parties-in-interest. Paper 9, 2. In that Order, we also stated that upon the filing of the updated mandatory notice, "a new filing date will be set as of the date the updated mandatory notice is filed." *Id.*[1] On March 20, 2015, Mercedes-Benz filed its amended mandatory notice identifying Daimler North America Corporation and Daimler AG as additional real parties-in-interest (Paper 10); thus, the Petition is accorded a filing date of March 20, 2015, in accordance with our Order on Motion to Amend the Mandatory Notice. Paper 9, 2.

In the Order on Motion to Amend the Mandatory Notice, we extended the deadline for Patent Owner's Preliminary Response to April 16, 2015. *Id.*

---

[1] Petitioner Mercedes-Benz LLC previously agreed that a new filing date would need to be accorded to the Petitioner during a conference call with the Board. Paper 9, 2 (citing Conference Call Transcript, Ex. 1010, 7:18–23).

at 3. Patent Owner argues in its Preliminary Response that the Petition
should be dismissed because Petitioner still fails to identify all necessary real
parties-in-interest, namely Verizon Telematics, Inc. ("Verizon Telematics").
Prelim. Resp. 2–25. We analyze Patent Owner's RPI allegation below.

    *1. Principles of Law*

    "The Board relies on petitioner's identification of the RPI to
determine conflicts of interest for the Office, the credibility of evidence
presented in a proceeding, and standing of a party that previously has filed a
civil action involving a patent for which an [*inter partes* review] is
requested." *GEA Process Eng'g. Inc. v. Steuben Foods, Inc.*, Case IPR2014-
00041, slip op. at 24 (PTAB Feb. 11, 2015) (Paper 140). We have held that
the determination of whether a Petition identifies all RPIs is a "threshold
issue," on which Petitioner bears the burden of persuasion. *See Atlanta Gas
Light Co. v. Bennett Regulator Guards, Inc.*, Case IPR2013-00453, slip op.
at 7–8 (PTAB Jan. 6, 2015) (Paper 88).

    Our Practice Guide explains that an RPI, as used in the AIA trial
context, "is the party that desires review of the patent. Thus, the 'real party-
in-interest' may be the petitioner itself, and/or it may be the party or parties
at whose behest the petition has been filed." Office Patent Trial Practice
Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012). The determination of
whether a party is an RPI is a "highly fact-dependent question" (*id.*), in
which the focus is on the party's relationship to the *inter partes* review
pending before the Board, and the degree of control the party can exert over
the proceeding. *See Aruze Gaming Macau, Ltd. v. MGT Gaming, Inc.*, Case
IPR2014-01288, slip op. at 11 (PTAB Feb. 20, 2015) (Paper 13). "[I]f a
nonparty can influence a petitioner's actions in a proceeding before the

Board, to the degree that would be expected from a formal co-petitioner, that nonparty should be considered an RPI to the proceeding." *Id.* at 12.

The RPI determination is highly fact dependent and requires the Board to consider a totality of the evidence, including the relationship of the parties and any agreements between the parties. For example, "[t]he mere existence of an indemnification agreement [however] does not establish that the indemnitor has the opportunity to control an *inter partes* review." *Nissan North America, Inc. v. Diamond Coating Tech., LLC,* Case IPR2014-01546, slip. op. at 7 (PTAB Apr. 21, 2015) (determining that the existence of an indemnification agreement was not sufficient to establish that the unnamed parties were real parties-in-interest to the *inter partes* review proceeding).

### 2. Analysis of Patent Owner's Allegation that Verizon Telematics is a Real Party-In-Interest

In its Preliminary Response, Patent Owner provides an extensive history between Mercedes-Benz and Verizon Telematics, including numerous predecessors to Verizon Telematics. Prelim. Resp. 5–13. Patent Owner argues that Mercedes-Benz entered into a Telematics Services Agreement ("TSA") (Ex. 2002) and an Amended and Restated Telematics Services Agreement ("Restated TSA") (Ex. 2004) with Hughes Telematics, which later became Verizon Telematics, to provide telematics services to purchasers of automobiles sold by Mercedes-Benz. *Id.* at 5–6. Patent Owner argues that the TSA requires Verizon Telematics and Mercedes-Benz to share expenses incurred in connection with the telematics venture and to share revenues generated from subscription agreements. Prelim. Resp. 7 (citing Ex. 2002, §§ 2, 9 (pp.18–19, 21–22)). Additionally, Patent Owner argues that the Restated TSA provides for certain rights of indemnification

between Mercedes-Benz and Verizon Telematics for damages, expenses, and other costs arising from intellectual property matters (the "Indemnification Provisions"). Prelim. Resp. 9 (citing Ex. 2004, § 15 (pp. 27–32)).

Patent Owner argues that the "Indemnification Provisions set forth express rights granted to Verizon Telematics in the event that Petitioner elects to retain its own counsel in defense of intellectual property claims against the telematics venture[;]" including: (1) Verizon Telematics has control over Mercedes-Benz's choice of counsel, (2) Mercedes-Benz's counsel is required to cooperate with Verizon Telematics, (3) Mercedes-Benz's counsel is required to enter into a joint defense or similar arrangements, and (4) Mercedes-Benz may not settle, compromise, or consent to the entry of judgment without the consent of Verizon Telematics. Prelim. Resp. 17–18 (citing Ex. 2004, § 15(c) (p.31)). Patent Owner argues that these terms of the Indemnification Provisions provide Verizon Telematics with the right to exercise control over this *inter partes* review proceeding. Prelim. Resp. 17–19. Patent Owner further argues that control given to Verizon Telematics creates a legal relationship under the Supreme Court's decision in *Taylor v. Sturgell*, 553 U.S. 880 (2008), such that Mercedes-Benz is acting as the agent or proxy of Verizon Telematics and must have been named as real party-in-interest in this proceeding. Prelim. Resp. 17–19 (citing *Taylor*, 553 U.S. at 894 (a "party bound by a judgment may not avoid its preclusive force by relitigating through a proxy")).

Petitioner disagrees and argued in an email to the Board and the Patent Owner that "Verizon is not funding and has no direction or control over this proceeding or, for that matter, the co-pending district court case."

Ex. 2013, 1. Additionally, Petitioner states that Mercedes-Benz "has not tendered any indemnification notice to Verizon" with respect to the District Court litigation against Mercedes-Benz, and, in fact, Verizon moved to intervene in the District Court case against Assetworks LLC, but Verizon did not move to intervene the District Court case against Mercedes-Benz. *Id.*

Upon review of the Indemnification Provisions of the Restated TSA, we are not persuaded that Patent Owner has sufficiently established that Verizon Telematics does in fact have the benefits of all of the contractual rights in the Indemnification Provisions identified above by Patent Owner. *See* Ex. 2004, 27–32. Section 15(c) of Restated TSA provides the "Indemnification Procedure" and states:

> [w]henever a claim arises for indemnification under this Section 15, the Person entitled to indemnification (the "Indemnified Party") will promptly notify the Party from which indemnification is sought (the "Indemnifying Party") of such claim . . . . *Following receipt of notice of a claim by a third party* . . . the Indemnifying Party will have the option, at its cost and expense, to assume the defense of such matter and to retain counsel to defend any such claim . . . . *The Indemnified Party will have the option of joining the defense of such claim* (which will be at the sole cost and expense of the Indemnified Party) with counsel not reasonably objected to by the Indemnifying Party and counsel will . . . cooperate with the other Party and any counsel designated by that Party. In effecting the settlement or compromise of, of consenting to the entry of any judgment with respect to, *any such claim*, the Indemnifying Party, or the Indemnified Party, as the case may be, will act in good faith, will consult with the other Party and will enter into only such settlement or compromise or consent to the entry of judgment as the other Party will consent, such consent not to be unreasonably withheld, conditioned or delayed.

Ex. 2004, § 15 (pp. 44–45) (emphases added). In view of the language of the Indemnification Provisions, the Restated TSA provides that Indemnified Party must provide "*notice of a claim by a third party*" to invoke the "Indemnification Procedure." *Id.* (emphasis added). Once the "Indemnification Procedure" has been invoked, the "Indemnified Party will have the option of *joining the defense* of such claim," thereby conveying the enumerated contractual rights to the "Indemnifying Party," such as the ability to object to counsel and the obligation to cooperate. *Id.* (emphasis added). The phrase "joining the defense" set forth in the "Indemnification Procedure" indicates that the Indemnified Party is joining to the defense being conducted by the Indemnifying Party as invoked under the "Indemnification Procedure," not that the potentially Indemnified Party is conducting its own solo defense. *Id.* Accordingly, Mercedes-Benz would need to invoke the "Indemnification Procedure," obtain the benefits of indemnification by Verizon Telematics afforded under the Restated TSA, and then Mercedes-Benz, the Indemnified Party, would need to elect the "option of joining the defense" to convey the enumerated contractual rights to Verizon Telematics, the Indemnifying Party. *See* Ex. 2004, § 15(c), "Indemnification Procedure" (pp. 44–45). In short, until Mercedes-Benz has invoked indemnification, Verizon Telematics does not have the rights provided by the Indemnification Provision over Mercedes-Benz. *See id.* Based on the record before us, there is no evidence that Mercedes-Benz has invoked indemnification, as the only relevant facts of record to that end are Mercedes-Benz's statements that it has not invoked indemnification and that "Verizon is not funding and has no direction or control over this proceeding." Ex. 2013, 1.

Based on the record before us, we determine that Verizon Telematics is not a real-party-in-interest to this proceeding. The mere existence of an indemnification agreement does not establish that the indemnitor has the opportunity to control an *inter partes* review, especially where, as here, the agreement permits the indemnitee discretion over whether the indemnitors must defend against patent infringement allegations. Furthermore, based on the record before us, Patent Owner has not established that Verizon Telematics has the ability to control the present proceeding to the degree that would be expected from a formal copetitioner. As such, we are not persuaded that Verizon Telematics is an RPI to this proceeding, and the fact that the Petition does not identify this party does not prevent the Board from considering Petitioner's grounds of unpatentability.

### D. The '701 Patent

The '701 patent is titled "Transportation Monitoring System for Detecting The Approach of a Specific Vehicle" and generally relates to a system that includes a receiver to detect the transmission of signals and, responsive to the reception, to check for a code that identifies a particular vehicle of interest. Ex. 1001, Abstract. The challenged claims relate to systems for detecting the approach of a vehicle and a means for alerting a person to the proximity of a transmitter. Claim 1 is reproduced below:

1. A system for detecting the approach of a vehicle, comprising:

a vehicle transmitter which operatively transmits at least one code beyond said vehicle transmitter;

a code generator that generates a representative code selected from a plurality of codes which is representative of said vehicle transmitter and discernable from others of said plurality of codes, said code generator operatively coupled to said vehicle

transmitter to couple said representative code to said vehicle transmitter for transmission of a signal therefrom;

a receiver remote from said vehicle transmitter having a signal receiver operatively monitoring transmitted signals from said vehicle transmitter at a signal strength at said receiver of at least a first threshold and having a code demodulator responsive to said signal receiver extracting said representative code from said signal;

a code detector comparing said representative code to at least one user-selected code and generating an indication of identity therewith; and

a lock-out for preventing said generation of indication of identity with said at least one user-selected code.

The '701 patent describes an embodiment in which system 10 detects the approach of vehicle 15, and system 100 includes transmitter unit 100 and receiver 200. Ex. 1001, 4:33–35, 5:27–28. Figure 1 of the '701 patent, reproduced below, illustrates system 10 having transmitter unit 100 and receiver 200:



FIG. 1

<mark>As shown above in Figure 1, the '701 patent discloses a bus, transit vehicle 15, having transmitter 100 for generating a signal, i.e., radio waves 17. *Id.* at 4:57–5:9. Additionally, as shown above in Figure 1, radio waves 17 are received by receiver 200 located in shelter 30 housing passenger 40. *Id.* at 5:1–20. Transmitter 100 generates a signal within range of reception of receiver 200, which "will in turn trigger receiver 200 to notify passenger 40." *Id.* at 5:8–11. "Most preferably, the notification will be sufficiently advanced to permit passenger 40 to reach boarding site 25 at the same time or just slightly before transit vehicle 15." *Id.* at 5:17–20. Additionally, the '701 patent discloses that system 100 can use microprocessor 220 to nullify an active alarm and "provide a lock-out for a pre-determined or programmable time period." *Id.* at 7:54–58. For example, in one embodiment the '701 patent describes that transit vehicle 15 may take a</mark>

serpentine path through a region, which might cause prior art distant-based systems to falsely activate each time the transit vehicle gets close to a receiver, but the disclosed lock-out feature allows for system 100 to prevent an alarm for a pre-determined time. *Id.* 7:49–58.

### E. The Asserted Grounds of Unpatentability

Petitioner challenges the patentability of claims 1–2 and 4–17 of the '701 patent based on the following grounds:

| References | Basis | Claim(s) Challenged |
|---|---|---|
| Porter[2] alone or in view of Dulaney[3] | §§ 102 & 103 | 1–2, 4–5, 10–14, and 16 |
| Porter (alone or as modified by Dulaney) in view of Brei[4] | § 103 | 5–9 and 15 |
| Porter (alone or as modified by Dulaney) in view of Sadamori[5] | § 103 | 17 |
| Winkler[6] alone or in view of Dulaney | §§ 102 & 103 | 1–2, 4–5, 10–14, and 16 |
| Winkler (alone or as modified by Dulaney) in view of Brei | § 103 | 5–9 and 15 |
| Winkler (alone or as modified by Dulaney) in view of Sadamori | § 103 | 17 |

---

[2] US Patent No. 6,714,142 B2, filed Dec. 31, 2001 (Ex. 1003) ("Porter").
[3] PCT International Publication WO 93/13503, pub. July 8, 1993 (Ex. 1005) ("Dulaney").
[4] US Patent No. 6,636,160 B2, filed June 19, 2001 (Ex. 1006) ("Brei").
[5] US Patent No. 5,311,172, filed Dec. 18, 1990 (Ex. 1007) ("Sadamori").
[6] US Patent No. 6,700,506 B1, filed Sept. 14, 2000 (Ex. 1004) ("Winkler").

II.　ANALYSIS

*A. Claim Construction*

Consistent with the statute and the legislative history of the Leahy-Smith America Invents Act,[7] the Board will interpret claims of an unexpired patent using the broadest reasonable construction in light of the Specification of the patent. *See* 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1279–83 (Fed. Cir. 2015).

*1.　"a lock-out for preventing said generation of indication of identity with said at least one user-selected code"*

Claim 1 recites "a lock-out for preventing said generation of indication of identity with said at least one user-selected code" (the "'lock-out' limitation"). Petitioner argues that the '701 patent Specification describes the "lock-out" feature as using a microprocessor in the receiver to "provide a lock-out for a pre-determined or programmable time period." Pet. 8 (quoting Ex. 1001, 7:54–58). Furthermore, Petitioner argues that the '701 patent Specification describes that, with the lock-out feature, the user can "temporarily disable detection of a specific vehicle code." Pet. 8–9 (quoting Ex. 1001, 8:33–41). Accordingly, Petitioner argues that, under the broadest reasonable interpretation, the "lock-out" limitation term should be construed as "wherein said receiver can prevent the triggering of an undesired alert."

Patent Owner argues that Petitioner's construction is unreasonably broad, because it omits the time-based characteristics of the "lock-out" present in every embodiment of the invention and ignores that the "lock-out" applies to a specific vehicle, as opposed to all vehicles. Prelim. Resp. 31.

---

[7] Pub. L. No. 112-29,125 Stat. 284 (2011).

13

Patent Owner argues that "a lock-out for preventing said generation of
indication of identity with said at least one user-selected code" should be
construed as "wherein said receiver can prevent the triggering of a user-
selected alert associated with a specific vehicle or vehicle transmitter for a
pre-determined or programmable time period." *Id.* at 30.

We are not persuaded that either party has provided the broadest
reasonable interpretation of the claim limitation. Both parties propose a
construction that includes "said receiver" when the claim limitation does not
include a recitation of "said receiver," but merely "a lock-out." Thus, when
"said receiver" is omitted from Petitioner's construction, we are
unpersuaded that the remaining terms differ materially from the claim
limitation, as written. Furthermore, the plain and ordinary meaning of the
term "preventing said generation of indication of identity" does not
necessarily require either an association with a specific vehicle, or vehicle
transmitter for a pre-determined or programmable time period, as proposed
by Patent Owner. *See* Prelim. Resp. 30. Claim 1 does require, however, that
"preventing *said generation*" be related to the previous claim limitation
reciting "generating an indication of identity therewith." Accordingly, for
purposes of this decision, we are unpersuaded that either party's
modification is necessary, and thus we construe the broadest reasonable
interpretation of "a lock-out for preventing said generation of indication of
identity with said at least one user-selected code" according to its plain and
ordinary meaning.

2. *"a means within said receiver for comparing said code to a plurality of stored values and responsive to a match therewith generating a signal indicative of a match"*

Claim 10 recites "means within said receiver for comparing said code to a plurality of stored values." As an initial matter, on this record, we are persuaded that this is a means-plus-function limitation because the term "means" is modified by functional language, and the term "means" is not modified by sufficient structure recited in the claim to perform the recited function(s). Consequently, this means-plus-function limitation requires construction under 35 U.S.C. § 112 ¶ 6.[8]

When construing a means-plus-function limitation under § 112 ¶ 6, we first must identify the claimed function, and then we look to the specification to identify the corresponding structure that actually performs the claimed function. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002). With respect to the second step, "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Golight, Inc. v. Wal-Mart Stores Inc.*, 355 F.3d 1327, 1334 (Fed. Cir. 2004) (citations and quotation marks omitted). If the specification fails to provide sufficient structure, the means-plus-function limitation is indefinite under 35 U.S.C.

---

[8] Section 4(c) of the Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284 (2011) ("AIA") re-designated 35 U.S.C. §112, ¶ 6, as 35 U.S.C. § 112(f). Because the '701 patent has a filing date prior to September 16, 2012, the effective date of § 4(c) of the AIA, we refer to the pre-AIA version of 35 U.S.C. § 112.

§ 112 ¶ 2; *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

The parties agree that the function of this means-plus-function clause is "comparing said code to a plurality of stored values responsive to a match therewith triggering an alarm or an alert." Pet. 9, Prelim. Resp. 31. Petitioner argues that the corresponding structure for performing such a function is microprocessor 220 and alarm 280 of receiver 200. Pet. 9. Patent Owner disagrees with Petitioner's identification of the corresponding structure, and argues that the function is not limited to an "audio alarm 280," as the alerts can be audible or visual. Prelim. Resp. 31–32 (citing Ex. 1001, 5:1–2, 11–14). We agree with Patent Owner. The '701 patent Specification discloses both a "first visual alarm" and a "subsequent audible alarm." Ex. 1001, 5:14–15. Furthermore, the '701 patent Specification discloses that "human-understandable output is provided through display 270 and audio alarm 280." *Id.* at 7:9–10. Therefore, for purposes of this decision, we determine that the function of this means-plus-function clause is "comparing said code to a plurality of stored values responsive to a match therewith triggering an alarm or an alert" and the corresponding structure is microprocessor 220 with audio alarm 280 and/or display 270.

### 3. *"a means to prevent at least one of said plurality of stored values from being included in said match signal generating"*

Claim 10 also recites "a means to prevent at least one of said plurality of stored values from being included in said match signal generating." Petitioner argues that the function of this means-plus-function clause is to prevent the system from triggering an undesired alert and that the structure in the '701 patent Specification identifies a microprocessor 220 to perform such function. Pet. 10 (citing Ex. 1001, 7:54–58). Accordingly, Petitioner

argues that that the function of this means-plus-function clause should be construed as "preventing the triggering of an undesired alarm or alert," and that the corresponding structure for performing such a function is microprocessor 220. Pet. 10.

Patent Owner argues that the function of this means-plus-function clause should be construed as "to prevent the triggering of a user-selected alert associated with a specific vehicle or vehicle transmitter for a predetermined or programmable time period." Prelim. Resp. 33. As with the construction of the "lock-out" limitation in claim 1, we determine that the means-plus-function clause "means to prevent at least one of said plurality of stored values from being included in said match signal generating" does not necessarily require either a specific vehicle or a pre-determined or programmable time period, as proposed by Patent Owner. Patent Owner agrees with Petitioner that the corresponding structure for this means-plus-function clause is microprocessor 220 in receiver 200. *Id.* at 34 (citing Ex. 1001, Fig. 2, 6:57–67, 7:1–17, and 7:42–63). Therefore, for purposes of this decision, we determine that the function of this means-plus-function clause is the recited function and that the corresponding structure is microprocessor 220.

> 4. *"means for detecting the elapse of a time interval, and, responsive thereto, disabling said preventing means."*

Claim 13 recites "a means for detecting the elapse of a time interval, and, responsive thereto, disabling said preventing means." Petitioner argues that the function of this means-plus-function clause is the recited function. Pet. 11. Specifically, Petitioner argues that claim 13 adds that the "lock-out" feature will be disabled after a certain period, such that the system will again trigger alerts. Pet. 11. Petitioner further argues that the function of this

means-plus-function clause should be construed as the recited function and that the corresponding structure is the microprocessor 220. Pet. 11. Patent Owner does not address this means-plus-function clause. On this record, we agree with Petitioner's proposed construction and the corresponding structure and adopt it for purposes of this decision.

> 5. *"a means for detecting a transmission collision and re-transmitting said common transmission signal responsive thereto"*

Claim 17 recites "a means for detecting a transmission collision and re-transmitting said common transmission signal responsive thereto." Petitioner argues the '701 patent specification provides no disclosure regarding this term, other than stating "[w]here necessitated, RF collision detection and avoidance may also be incorporated." Pet. 11 (citing Ex. 1001, 3:59–61). Petitioner also argues that the '701 patent fails to disclose corresponding structure for performing the recited function. Pet. 11. We disagree. As cited by Petitioner, the '701 patent Specification discloses RF collision detection to be performed by microprocessor 120 of transmitter 100. Ex. 1001, 3:59–61, 5:38–41. For purposes of this decision, we determine that the function of this means-plus-function clause should be construed as the recited function and that the corresponding structure is microprocessor 120.

### B. *Level of Ordinary Skill in the Art*

According to Petitioner's declarant, Mr. Scott Andrews, a person of ordinary skill in the art relevant to the '701 patent would have "a Bachelor of Science degree in electrical engineering or a comparable field" or have obtained this level of skill with training or several years of work experience with intelligent transportation systems. Scott Andrews Decl., Ex. 1008 ¶ 27.

Patent Owner does not offer, at this time, any contrary explanation regarding who would qualify as a person of ordinary skill in the art relevant to the '701 patent. Based on our review of the '701 patent, the types of problems and solutions described in the '701 patent and cited prior art, and the testimony of Petitioner's Declarant, we adopt, for purposes of this decision, Petitioner's definition of a person of ordinary skill in the art at the time of the claimed invention. Based on the stated qualifications of Mr. Andrews (Ex. 1008 ¶¶ 4–21), Petitioner's Declarant meets the requirements of this definition. We note that the applied prior art also reflects the appropriate level of skill at the time of the claimed invention. *See Okajima v. Bourdeau,* 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### C. Asserted Anticipation Based on Porter and Obviousness Based on Porter in View of Dulaney

#### 1. Overview of Porter

Porter is titled "Proximity Signaling System and Method" and discloses a flexible proximity signaling system and method particularly suited for use in providing early warning of the approach of a bus or vehicle. Ex. 1003, 1:29–52. Figure 1 from Porter illustrates the proximity signaling system, and is reproduced below:



Fig. 1

As shown above in Figure 1 from Porter, proximity signaling system 20
includes transmitter 22 and receiver 24 "for alerting a user 28 waiting at a
location 30 when a bus 26 approaches a boarding stop 32." *Id.* at 3:13–20.
Transmitter 22 generates an RF signal with a designated receiver address.
*Id.* at 3:21–25. Receiver 24 receives and verifies the transmitted RF signals
from transmitters 22 within range, displays the gradual proximity of
transmitter 22 to receiver 24, and notifies user 28 of a desired vehicle's
pending arrival when the signal reaches a predetermined strength. *Id.* at
4:16–22. The proximity alerts can be visual signals or audio signals. *Id.* at
5:5–9. Porter discloses that the proximity alerts can be generated by voice
chip 94, which is activated when a signal having the desired receiver address
reaches a desired signal strength. *Id.* at 5:36–37.

20

Once activated, the voice chip 94 may be deactivated in any
number of ways. For example, the voice chip 94 may play the
message once or any preset number of times, the voice chip 94
may repeat the message until the signal strength falls below a
desired value, the voice chip 94 may repeat the message for a
preset time period, or the voice chip 94 may repeat the message
until manually deactivated.

*Id.* at 5:38–44.

### 2. *Overview of Dulaney*

Dulaney is titled "Commuter Notification System for Mass Transit

Applications" and describes a commuter notification system for alerting the

commuter of the arrival of the transit vehicle at a preselected transit

destination. Ex. 1005, Abstract. Figure 2 from Dulaney illustrates the

commuter notification system, and is reproduced below:



## FIG. 2

As shown above in Figure 2 from Dulaney, commuter notification system 10

includes transmitters 18 and 20 at fixed distances from destination station

22. *Id.* at 5:32–36. Transmitters 18 and 20 transmit notification signals

identifying transit destinations 22 and notification receivers 40, carried by

commuter and responsive to the transmitted notification signals, to alert the

commuter of the arrival of transit vehicle 26. *Id.* at Abstract. Dulaney

discloses that the receiver provides a "lockout timer" to prevent multiple alerts from being generated for the commuter. *Id.* at 14:24–28.

> The lockout timer insures that once the predetermined destination address is detected, no further detection of the same destination address is allowed for the duration of the lockout time, thereby preventing multiple alerts from being generated, should the commuter remain within range of the notification transmitter during the predetermined time interval.

*Id.* at 14:28–35.

### 3. Analysis

Petitioner argues that claims 1–2, 4–5, 10–14, and 16 are anticipated by Porter or would have been obvious in view of Porter in combination with Dulaney. Pet. 4–26. In support of these asserted grounds of unpatentability, Petitioner provides its arguments and proffers a Declaration of Mr. Andrews to support its contentions. Pet. 4–26; Ex. 1008.

### a. Asserted Anticipation Based on Porter

The Petition provides arguments with respect to this proposed ground for each of claims 1–2, 4–5, 10–14, and 16. Pet. 4–26. We begin with a summary of Petitioner's challenge to the elements of claim 1 and then address Patent Owner's arguments against this challenge.

Petitioner's challenges to the limitations of claim 1 based on the Porter can be summarized as follows: "a vehicle transmitter which transmits at least one code" (Porter's vehicle transmitter 22 sending a signal to remote receivers 24 (Pet. 13–15)), "a code generator that generates a representative code selected from a plurality of codes" (Porter's data input device 36 that generates a selected receiver address in binary code (Pet. 15–16)), "a receiver remote from said vehicle transmitter" (Porter's receiver 24 (Pet. 16-18)), "a code detector comparing said representative code to at least one

user-selected code" (Porter's microcontroller decoder 78, which decodes the signal and compares the receiver address of the signal to one or more selected receiver addresses for a match (Pet. 19–20)) "a lock-out for preventing said generation of indication of identity with said at least one user-selected code" (Porter's "voice chip 94 may play the message once or any preset number of times [or] the voice chip 94 may repeat the message for a preset time period" (Pet. 21 (quoting Ex. 1003, 5:36–44))). Pet. 21–22 (Ex. 1008 ¶ 43).

Patent Owner argues that Porter does not disclose "a lock-out for preventing said generation of indication of identity with said at least one user-selected code," as recited in claim 1. Prelim. Resp. 38–40. Specifically, Patent Owner argues that Porter simply discloses that voice chip 94, activated by an approaching bus, may be configured to stop playing a message after a preset number of times. Prelim. Resp. 39. Patent Owner argues that Porter simply deactivates an already active voice chip, as opposed to "preventing" the generation of alerts, as required by claim 1. *Id.* We agree. Petitioner relies upon disclosure from Porter that states "[o]nce activated, *the voice chip 94 may be deactivated* in any number of ways," including playing the message once, a preset number of times, or playing the message until signal strength falls below a desired value. Pet. 22 (quoting Ex. 1003, 5:36–44) (emphasis added). As discussed above, for purposes of this decision, we construe "a lock-out for preventing said generation of indication of identity with said at least one user-selected code" according to its plain an ordinary meaning. Therefore, to anticipate this claim element, Porter must disclose actively *preventing* the generation of an indication of identity *before* it occurs, but the cited disclosure from Porter discloses only

passively *deactivating after* the initial generating an indication of identity has occurred. Petitioner's declarant, Mr. Andrews, testifies that Porter discloses the prevention of the generation of another alert if a further match is detected (Ex. 1008 ¶ 59), but Mr. Andrews fails to provide any additional disclosure from Porter to support his statement. Accordingly, we are not persuaded that Porter discloses the "lock-out" limitation recited in claim 1.

Petitioner alternatively argues that Porter discloses the "lock-out" limitation by disclosing that the user can adjust the sensitivity of the receiver to activate only when the received signal reaches a desired signal strength. Pet. 21 (citing Ex. 1003, 5:36–37; Ex. 1008 ¶ 60). Petitioner argues that adjusting the sensitivity amounts to a "lock-out" until the signal reaches a selected strength. Pet. 22. Patent Owner counters that Porter's disclosure of adjusting the sensitivity of the receivers does not amount to a lock-out for preventing the generation of identity. Prelim. Resp. 40. We agree that those features are not technically analogous. Specifically, we are not persuaded by Petitioner that adjusting sensitivity meets the claimed limitation regarding preventing the generation of identity.

Based on the record before us, we determine that Petitioner fails to demonstrate a reasonable likelihood of prevailing on its challenge that independent claim 1, or claims 2 and 4–5 dependent therefrom, are anticipated by Porter. Similar to claim 1, claim 10 recites "a means to prevent at least one of said plurality of stored values from being included in said match signal generating," for which we construed the function above as "preventing the triggering of an undesired alarm or alert." Similar to claim 1, we are not persuaded by Petitioner's arguments that Porter discloses "preventing the triggering of an undesired alarm or alert." Based on the

record before us, we determine that Petitioner fails to demonstrate a
reasonable likelihood of prevailing on its challenge that independent claim
10, or claims 11–14 and 16 dependent therefrom, are anticipated by Porter.

### b. Asserted Obviousness Based on Porter and Dulaney

Petitioner alternatively challenges that claims 1–2, 4–5, 10–14, and 16
would have been obvious over Porter and Dulaney. Pet. 12–26. Petitioner
argues that the "lock-out" limitation in claim 1 would have been obvious in
view of a combination of Porter with the "lock out" timer disclosed in
Dulaney. Pet. 23–24. Petitioner argues that Dulaney discloses a "lock out
timer" for "inhibiting the further generation of sensible alerts" and a person
of ordinary skill in the art would have combined this "lock out timer" with
the Porter receiver to ensure it did not generate unwanted alerts for a user for
a predetermined time interval. Pet. 23–24 (citing Ex. 1005, 14:24–25,
20:35–37; Ex. 1008 ¶¶ 61–62). Unlike Petitioner's arguments for Porter
alone, we are sufficiently persuaded, for purposes of this decision, that
Dulaney teaches "preventing said generation of indication of identity," and
not just deactivating an already active alarm. Specifically, the cited portions
of Dulaney state that "[t]he lockout timer insures that once the
predetermined destination address is detected, no further detection of the
same destination address is allowed for the duration of the lockout time,
thereby *preventing multiple alerts from being generated*." Ex. 1005, 14:28–
33. Thus, Dulaney discloses more than just passively deactivating an alert;
it discloses actively preventing an alert.

Patent Owner argues that a person of ordinary skill in the art would
not have combined Dulaney with Porter because Dulaney relies on mobile
receivers and Porter relies upon immobile receivers. Prelim. Resp. 55.

Patent Owner fails to identify, however, how the mobility of the receivers in Dulaney would affect the combination of the "lock out timer" disclosed in Dulaney with the receivers in Porter. The obviousness inquiry does not ask "whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole." *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc). "The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference . . . ." *In re Keller*, 642 F.2d 413, 425 (CCPA 1981); *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012). As set forth by Petitioner, both references are related to transit notification systems and are concerned with users receiving unwanted alerts. Pet. 23. Accordingly, we are not persuaded that Porter and Dulaney are an improper combination.

We have reviewed Petitioner's analysis and supporting evidence regarding the proposed ground of obviousness based on Porter and Dulaney. On the record before us, we are persuaded that Petitioner has demonstrated a reasonable likelihood that claims 1–2, 4–5, 10–14, and 16 of the '701 patent would have been obvious in view of Porter and Dulaney.

### D. Asserted Obviousness of Claims 5–9 and 15 Based on Porter, Dulaney, and Brei[9]

#### 1. Overview of Brei

Brei is titled "Transit Information Display System" and discloses a transmit information display communication system having an information display. Ex. 1006, Abstract. Transit information system 100 includes radio frequency receivers to receive transmissions to be presented on displays or signs 160. *Id.* at 2:44–56. Brei discloses that system 100 transmits data packets and, for each data packet, a "Msg_Header" can be included as the first 4 bytes of the packet. *Id.* at 6:50–52, 7:40–8:55.

#### 2. Analysis

Claim 5 is dependent from claim 1 and adds the following limitation: "wherein said code generator further generates a header within said at least one code." Petitioner argues that Porter discloses adding a "header" to the data packet comprising the code. Pet. 25 (citing Ex. 1003, 3:38–47). In fact, Porter discloses that the output of the encoder 38 is divided into data packets and "headers 52 and 54 (FIG. 3) may be used." Ex. 1003, 3:38–43. Mr. Andrews states that headers disclosed in Porter are the same as the "fixed header" described as being added to the data packet including the code in the '701 patent. Ex. 1008 ¶¶ 71–72. Furthermore, Petitioner argues that Brei teaches using headers at the beginning of each message to provide

---

[9] Petitioner's table of asserted grounds identifies the challenge to claims 5–9 and 15 as based on "Porter (alone or as modified by Dulaney), in view of Brei." Pet. 4. The body of Petition identifies this challenge to claims 5–9 and 15 differently. For example, with respect to claim 5, the Petition states that "Porter Anticipates or Renders Obvious Claim 5, Either Alone or In View of Brei." Pet. 25. For purposes of this decision, we will consider the challenge to claims 5–9 and 15 as stated in the table of asserted grounds.

control information about the message. Pet. 26 (citing Ex. 1006, 6:50–52, 7:40–8:55). Petitioner also argues that a person of ordinary skill in the art would have combined Brei's headers with Porter to enable the transmitters in Porter to provide control-related information to the receivers. Pet. 26 (citing Ex. 1008 ¶ 74). ). On the record before us, we are persuaded that Petitioner has demonstrated a reasonable likelihood that claim 5 of the '701 patent would have been obvious in view of Porter and Brei.

Claims 6–9 depend from claim 5 and provide further limitations regarding the "header" recited in claim 5. Claim 15 depends from claim 10 and is similar to claim 5 in the recitation of a code including a "header." Petitioner argues that the disclosures in Porter and Brei render the additional limitations set forth in these dependent claims obvious. Pet. 26–28, 36–37. We have reviewed Petitioner's analysis and supporting evidence regarding the proposed ground of obviousness based on Porter, Dulaney, and Brei. On the record before us, we are persuaded that Petitioner has demonstrated a reasonable likelihood that claims 6–9 and 15 of the '701 patent would have been obvious in view of Porter, Dulaney, and Brei.

### E. Asserted Obviousness of Claim 17 Based on Porter, Dulaney, and Sadamori[10]

#### 1. Overview of Sadamori

Sadamori is titled "Communication Control System" and discloses a communication system including multiple communication stations that communicate with each other over a communication channel. Ex. 1007, Abstract. Communication station 4 includes collision detecting unit 9 that detects a collision of a transmitting frame on communication channel 3 and activates an after-collision restoring unit 10 to send out a direction of retransmission. *Id.* at 4:47–62.

#### 2. Analysis

Claim 17 is dependent from claim 10 and adds the following limitation: "a means for detecting a transmission collision and re-transmitting said common transmission signal responsive thereto." As stated above, for purposes of this decision, we determine that the function of this means-plus-function clause should be construed as the recited function. Petitioner argues that Sadamori discloses a collision detecting unit that detects a collision of transmission data and causes the retransmission of data bringing about the collision. Pet. 38 (citing Ex. 1007, 4:37–5:6). Petitioner also argues that a person of ordinary skill in the art would have combined the teachings of the communication systems in Sadamori with the

---

[10] Similar to the previous challenge involving Brei as discussed above, Petitioner's table of asserted grounds identifies a challenge to claim 17 based on "Porter (alone or as modified by Dulaney), in view of Sadamori." Pet. 4. The body of the Petition, however, identifies this challenge to claim 17 as "Porter In View of Sadamori Renders Obvious Claim 17." Pet. 38. For purposes of this decision, we will consider the challenge to claim 17 as stated in the table of asserted grounds.

communication systems in Porter to add a well-known feature to ensure that the Porter receivers properly received signals from all transmitters of interest. Pet. 38–39 (citing Ex. 1008 ¶ 114).[11]

We have reviewed Petitioner's analysis and supporting evidence regarding the proposed ground of obviousness based on Porter, Dulaney, and Sadamori. On the record before us, we are persuaded that Petitioner has demonstrated a reasonable likelihood that claim 17 of the '701 patent would have been obvious in view of Porter, Dulaney, and Sadamori.

### F. Asserted Anticipation Based on Winkler and Obviousness Based on Winkler in View of Dulaney

#### 1. Overview of Winkler

Winkler is titled "Bus Arrival Notification System and Methods Related Thereto" and discloses vehicle arrival notification system that will enable passengers to know the precise location and arrival time of the transporting vehicle several minutes before its arrival. Ex. 1004, 4:10–13. Figure 1 from Winkler illustrates the vehicle arrival notification system, and is reproduced below:

---

[11] We note that there appears to be a typo in the Petition, as Winkler is referenced at the bottom of page 38. Pet. 38–39. The cited portions of Mr. Andrews testimony, however, correctly refer to the Porter reference. *See* Ex. 1008 ¶ 114.



As shown above in Figure 1 from Winkler, vehicle arrival notification system 100 includes transmission apparatus 160 and receiving units 120, in houses and schools, located along a vehicle route to provide an alert of an approaching vehicle in advance of its arrival at a specified point on the vehicle route. *Id.* at 6:24–32. Transmission apparatus 160 transmits an RF signal that includes the vehicle identification and location information. *Id.* at 6:33–35.

Winkler also discloses that receiving unit 120 includes a learn function that enables the receiver to acquire information about a specified vehicle. *Id.* at 8:43–45. "Actuating the learn button or switch 124 when the correct vehicle is approaching a specified vehicle stop causes the receiving unit CPU 122 to acquire vehicle identification information from the strongest received RF signal and to store this vehicle identification

information in the receiving unit memory means." *Id.* at 8:45–51.
Additionally, Winkler discloses that system 100 provides a directional shield
to increase notification accuracy for vehicle arrival. *Id.* at 9:1–3. A
direction of travel parameter is included in the transmitted RF signal from a
bus, such that the receiving unit alert mechanism is only triggered when the
bus is traveling the desired direction. *Id.* at 9:19–24.

 *2. Analysis*

 Petitioner argues that claims 1–2, 4–5, 10–14, and 16 are anticipated
by Winkler or would have been obvious in view of Winkler in combination
with Dulaney. Pet. 39–60. In support of these asserted grounds of
unpatentability, Petitioner provides its arguments and proffers a Declaration
of Mr. Andrews to support its contentions. Pet. 39–60; Ex. 1008.

 *a. Asserted Anticipation Based on Winkler*

 The Petition provides arguments with respect to this proposed ground
for each of claims 1–2, 4–5, 10–14, and 16. Pet. 39–60. We begin with a
summary of Petitioner's challenge to the elements of claim 1 and then
address Patent Owner's arguments against this challenge.

 Petitioner's challenges to the limitations of claim 1 based on the
Winkler can be summarized as follows: "a vehicle transmitter which
transmits at least one code" (Winkler's transmission apparatus 160
including transmission module 166 that generates a RF signal (Pet. 39–40)),
"a code generator that generates a representative code selected from a
plurality of codes" (Winkler's CPU that receives vehicle identification
information and generates a signal including a code (Pet. 40–41)), "a
receiver remote from said vehicle transmitter" (Winkler's receiving unit 120
(Pet. 41–43)), "a code detector comparing said representative code to at least

one user-selected code" (Winkler's receiving unit 120 including a learn function to acquire information about a specified vehicle and a CPU for comparing vehicle identification information included in a received RF signal to identification information for the correct vehicle stored in the receiving unit memory (Pet. 44–45)), and "a lock-out for preventing said generation of indication of identity with said at least one user-selected code" (Winkler's receiving unit mechanism which can be triggered only when receiving a transmission from a bus with correct bus route number traveling in the correction direction (Pet. 45–46)).

Patent Owner argues that Winkler does not disclose "a code detector comparing said representative code to at least one user-selected code and generating an indication of identity therewith," as recited in claim 1. Prelim. Resp. 43–44. Specifically, Patent Owner argues that Winkler's disclosure regarding the use of the learn function on receiving unit 120 "does not select a code to which the representative code is compared" because the user instructs Winkler's receiver to learn "vehicle identification information." Prelim. Resp. 44 (citing Ex. 1004, 8:43–50). We are not persuaded by Patent Owner's arguments because Patent Owner is essentially arguing that the recitation of "at least one user-selected code" in the apparatus of claim 1 requires that the user specifically select an actual code. This is contrary to the disclosure in the '701 patent, which provides that the user can select a code, such as "531," for a desired transmit vehicle or the user can select from descriptive text, such as "downtown." Ex. 1001, 8:12–22. Similarly, Winkler discloses that the user can select the learn function on the receiving unit 120 to store the vehicle identification information for a particular vehicle. Ex. 1004, 8:45–51. Accordingly, we are persuaded that Petitioner

sufficiently establishes, for purposes of this decision, that Winkler discloses
the claimed "at least one user-selected code."

Patent Owner also argues that Winkler does not disclose "a lock-out
for preventing said generation of indication of identity with said at least one
user-selected code," as recited in claim 1 Prelim. Resp. 45–48. Specifically,
Patent Owner argues that Petitioner's arguments are based on an
unreasonably broad construction of the "lock-out" limitation claim 1.
Prelim. Resp. 46. As discussed above, we do not adopt Patent Owner's
proposed construction of the "lock-out" element of claim 1. For purposes of
this decision, we construe the broadest reasonable interpretation of "a lock-
out for preventing said generation of indication of identity with said at least
one user-selected code" according to its plain and ordinary meaning, and are
persuaded that this limitation is met by Winkler.

Patent Owner argues that Winkler's receiver does not prevent the
triggering of any alerts, but, at most, Winkler delays an alert for a period of
time and "afterwards *always* plays the alert." Prelim. Resp. 47. Patent
Owner fails to provide any citation to Winkler to support this argument.
Contrary to Patent Owner's arguments, Winkler discloses as follows:

> By incorporating a direction of travel parameter into the
> information included in the transmitted RF signal from a bus,
> the *receiving unit alert mechanism is triggered only when
> receiving a transmission from a bus with the correct bus route
> number traveling in the correct direction located* within a
> specified distance threshold.

Ex. 1004, 9:19–24 (emphasis added). Thus, despite Patent Owner's
allegations, Winkler's receiving unit alert mechanism, as provided by the
passage above, does not always play the alert after a delay, but the alert is
"triggered only" by a bus with the correct route number traveling in the

34

correct direction. *See id.* Therefore, we are persuaded that Petitioner sufficiently establishes, for purposes of this decision, that by triggering the receiving unit alert mechanism only when desired bus is traveling in a certain direction, Winkler discloses the claimed "a lock-out for preventing said generation of indication of identity with said at least one user-selected code."

Patent Owner also argues that because Winkler does not disclose the "user-selected code," it does not disclose the "lock-out" claim limitation that expressly recites the "user-selected code." As discussed above, we are not persuaded by Patent Owner's arguments regarding the "user-selected code"; thus, we are similarly not persuaded by them for the "lock-out" limitation. Additionally, Patent Owner argues that Winkler does not anticipate independent claim 10 for the same reasons as claim 1. As with claim 1, we are similarly not persuaded by these arguments for claim 10.

We have reviewed Petitioner's analysis and supporting evidence regarding the proposed ground of anticipation based on Winkler. On the record before us, we are persuaded that Petitioner has demonstrated a reasonable likelihood that claims 1–2, 4–5, 10–14, and 16 of the '701 patent are anticipated by Winkler.

### b. *Asserted Obviousness Based on Winkler and Dulaney*

Petitioner additionally challenges that claims 1–2, 4–5, 10–14, and 16 would have been obvious over Winkler and Dulaney. Pet. 12–26. Petitioner argues that the "lock-out" limitation in claim 1 would have been obvious in view of a combination of Winkler with the "lock out" timer disclosed in Dulaney. Pet. 47. Petitioner argues that Dulaney discloses a "lock out timer" for inhibiting the generation alerts for a period of time and one of

ordinary skill bout have combined this "lock out timer" with the Winkler receiver to ensure it did not generate unwanted alerts for a user for a predetermined time interval. Pet. 47 (citing Ex. 1005, 14:24–25, 20:35–37; Ex. 1008 ¶ 132). We are sufficiently persuaded, for purposes of this decision, that Dulaney teaches "preventing said generation of indication of identity," and not just deactivating an already active alarm. Specifically, the cited portions of Dulaney states that "[t]he lockout timer insures that once the predetermined destination address is detected, no further detection of the same destination address is allowed for the duration of the lockout time, thereby *preventing multiple alerts from being generated*." Ex. 1005, 14:28–33 (emphasis added).

Patent Owner argues that a person of ordinary skill in the art would not have combined Dulaney with Winkler, because Dulaney relies on immobile transmitters and mobile receivers and Winkler relies upon mobile transmitters and immobile receivers. Prelim. Resp. 56. Similar to the arguments analyzed above with respect to the combination of Winkler and Dulaney, we are equally unpersuaded by these arguments against the combination of Winkler and Dulaney. Significantly, Patent Owner fails to identify how the immobility of the transmitters or the mobility of the receivers in Dulaney would affect the combination of the "lock out timer" disclosed in Dulaney with the receivers in Winkler. As set forth by Petitioner, both references are related to transit notification systems and are concerned with users receiving unwanted alerts. Pet. 47. Accordingly, we are not persuaded that Winkler and Dulaney are an improper combination.

We have reviewed Petitioner's analysis and supporting evidence regarding the proposed ground of obviousness based on Winkler and

Dulaney. On the record before us, we are persuaded that Petitioner has demonstrated a reasonable likelihood that claims 1–2, 4–5, 10–14, and 16 of the '701 patent would have been obvious in view of Winkler and Dulaney.

### G. Asserted Obviousness of Claims 5–9 and 15 Based on Winkler and Brei

Claim 5 is dependent from claim 1 and adds the following limitation: "wherein said code generator further generates a header within said at least one code." Petitioner argues that Winkler in view of Brei renders claim 5 obvious. Pet. 49 (citing Ex. 1008 ¶¶ 144–145). Petitioner argues that Brei teaches using headers at the beginning of each message to provide control information about the message. Pet. 49. Petitioner also argues that a person of ordinary skill in the art would have combined Brei's headers with Winkler to enable the transmitters in Winkler to provide control-related information to the receivers. Pet. 49 (citing Ex. 1008 ¶ 145). On the record before us, we are persuaded that Petitioner has demonstrated a reasonable likelihood that claim 5 of the '701 patent would have been obvious in view of Winkler and Brei.

Claims 6–9 depend from claim 5 and provide further limitations regarding the "header" recited in claim 5. Claim 15 depends from claim 10 and is similar to claim 5 in the recitation of a code including a "header." Petitioner argues that the disclosures in Winkler and Brei render the additional limitations set forth in these dependent claims obvious. Pet. 49–50, 57–58. We have reviewed Petitioner's analysis and supporting evidence regarding the proposed ground of obviousness based on Winkler and Brei. On the record before us, we are persuaded that Petitioner has demonstrated a reasonable likelihood that claims 6–9 and 15 of the '701 patent would have been obvious in view of Winkler and Brei.

*H. Asserted Obviousness of Claim 17 Based on Winkler and Sadamori*

Claim 17 is dependent from claim 10 and adds the following limitation: "a means for detecting a transmission collision and re-transmitting said common transmission signal responsive thereto." As stated above, for purposes of this decision we determinate that the function of this means-plus-function clause should be construed as the recited function. Petitioner argues that Sadamori discloses a collision detecting unit that detects a collision of transmission data and causes the retransmission of data bringing about the collision. Pet. 59 (citing Ex. 1007, 4:37–5:6). Petitioner also argues that a person of ordinary skill in the art would have combined the teachings of the communication systems in Sadamori with the communication systems in Winkler to add a well-known feature to ensure that the Winkler receivers properly received signals from all transmitters of interest. Pet. 59–60 (citing Ex. 1008 ¶ 187).

We have reviewed Petitioner's analysis and supporting evidence regarding the proposed ground of obviousness based on Winkler and Sadamori. On the record before us, we are persuaded that Petitioner has demonstrated a reasonable likelihood that claim 17 of the '701 patent would have been obvious in view of Winkler and Sadamori.

### III.    SUMMARY

For the forgoing reasons, we are persuaded that the information presented in the Petition establishes that there is a reasonable likelihood that Petitioner would prevail with respect to claims 1–2 and 4–17 of the '701 patent. At this stage of the proceeding, the Board has not made a final determination as to the patentability of any challenged claim.

IV. ORDER

Accordingly, it is

ORDERED that, pursuant to 35 U.S.C. § 314, an *inter partes* review is hereby instituted as to the challenged claims of the '701 patent on the following grounds:

1. Claims 1–2, 4–5, 10–14, and 16 of the '701 patent under 35 U.S.C. § 103(a) as unpatentable over Porter and Dulaney;

2. Claims 5–9 and 15 under 35 U.S.C. § 103(a) as unpatentable over Porter, Dulaney, and Brei;

3. Claim 17 under 35 U.S.C. § 103(a) as unpatentable over Porter, Dulaney, and Sadamori;

4. Claims 1–2, 4–5, 10–14, and 16 of the '701 patent under 35 U.S.C. § 102 as anticipated by Winkler;

5. Claims 1–2, 4–5, 10–14, and 16 of the '701 patent under 35 U.S.C. § 103(a) as unpatentable over Winkler and Dulaney;

6. Claims 5–9 and 15 under 35 U.S.C. § 103(a) as unpatentable over Winkler and Brei; and

7. Claim 17 under 35 U.S.C. § 103(a) as unpatentable over Winkler and Sadamori;

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(d) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial, the trial commencing on the entry date of this decision; and

FURTHER ORDERED that no other ground of unpatentability alleged in the Petition for any claim is authorized for this *inter partes* review.

PETITIONER:

Celine Crowson
Joseph Raffetto
Raymond Kurz
HOGAN LOVELLS US LLP
Celine.crowson@hoganlovells.com
Joseph.raffetto@hoganlovells.com
Raymond.kur@hoganlovells.com


PATENT OWNER:

John Kasha
KASHA LAW LLC
John.kasha@kashalaw.com

Dmitry Kheyfits
KHEYFITS & MALONEY LLP
dkheyfits@kheyfitsmaloney.com

EXHIBIT 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



PATENT LICENSING ALLIANCE

May 6, 2016

*VIA FEDERAL EXPRESS & ELECTRONIC MAIL*

Yukon Palmer, President
Veracity Wireless, Inc.
8305 Vickers St., Ste 1111
San Diego, CA 92111
888.803.0200

> **Re:** *U.S. Patent No. 6,958,701 – Transportation Monitoring System for Detecting the Approach of a Specific Vehicle ("Transportation Monitoring Patent")*

Dear Mr. Palmer:

Your FieldLogix employs the technology claimed and disclosed in United States Patent 6,958,701. *See* attached claim chart. The patented technology embodied in the Transportation Monitoring Patent was developed by John and Mark Storkamp and Ronald Menzhuber in 2002, and subsequently assigned to Virtual Fleet Management, LLC this year.

Our research group and legal team have reviewed FieldLogix and believe that it utilizes the technology claimed and disclosed in the Transportation Monitoring Patent. Because of the time and effort it took the Storkamps and Mr. Menzhuber to develop and protect this proprietary project coupled with the ever-increasing instances of improper use without a license, Virtual Fleet has been enforcing its intellectual property rights. Despite Virtual Fleet's enforcement efforts, the company prefers to license its technology to companies who have used and continue to need technology the patent provides.

The Patent requires a license if you intend to continue to sell these products. Under the patent statute 35 U.S.C. 271:

> (a) Except as otherwise provided in this title, whoever without authority **makes**, **uses**, **offers to sell, or sells** any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

> (b) Whoever actively induces infringement of a patent shall be liable as an infringer.

We are interested in reaching a direct, negotiated (and without litigation) licensing arrangement for all of your uses of the Transportation Monitoring Patent under your brand names and would like to discuss this matter with you. Should you desire any additional information, please do not hesitate to ask. Please contact us at your earliest convenience.

Patent Licensing Alliance
5251 South Green St., Suite 350
Murray, UT 84123

Sincerely,


PATENT LICENSING ALLIANCE
Kyla Welch / Account Manager

kyla@licensingalliance.com
P: 801.890.3566


**See enclosed:**

**Tab 1 -** Notice

**Tab 2** - US Patent 6,958,701

**Tab 3** - Claim Chart and Exhibits

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

EXHIBIT 4

28

COMPLAINT FOR DECLARATORY RELIEF re: (1) Non Patent Infringement; (2) Invalidity of Patent; and (3)
Unfair Competition Under State Law

12


## RE: FieldLogix - and U.S. Patent No. 6,958,701

**Yukon Palmer** <yjpalmer@fieldtechnologies.com>                    Mon, May 16, 2016 at 3:00 PM
To: kyla@licensingalliance.com
Cc: legal@fieldtechnologies.com

Ms. Welch,

This is to acknowledge receipt of your letter dated May 6, 2016 regarding technology claimed in US Patent number 6,958,701.

We will respond to this letter by July 15, 2016, provided that you answer the questions below on or before May 27, 2016.

We are requesting the following information from you:

1. The specific claim in your patent that you believe that we are infringing upon;

2. Your proposed licensing fees and ter;

3. A list of GPS fleet management providers that are currently licensing the technology in this patent from you.

Regards,
Yukon Palmer
CEO

--





EXHIBIT 5

COMPLAINT FOR DECLARATORY RELIEF re: (1) Non Patent Infringement; (2) Invalidity of Patent; and (3) Unfair Competition Under State Law

13

FieldLogix
8305 Vickers St. Ste. 101
San Diego, CA 92111
Toll Free: 888-803-0200
Fax: 858-863-4060



July 14, 2016

VIA USPS CERTIFIED MAIL

Patent Licensing Alliance
5251 South Green St., Suite 350
Murray, UT 84123

To whom it may concern:

This letter is in response to your letter dated May 6, 2016.

I attempted to reach out to your firm through the provided e-mail address of
kyla@licensingallinace.com on May 16, 2016 requesting the following items:

1. The specific claim in your patent that you believe that we are infringing upon;

2. Your proposed licensing fees;

3. A list of GPS fleet management providers that are currently licensing the technology
claimed in this patent from you.

I have not received a response from you.

*Here is our official response to your claim:*

1. We deny that we are infringing upon patent No. 6,958,701;

2. Prior art exists that could potentially invalidate your patent.

We have successfully disputed patent infringement claims from ArrivalStar S.A. (patent
Nos. 6,714,859 & 6,804,606) regarding the technology also claimed in your patent. In
this case, we discovered prior art from HighwayMaster Corporation who
commercialized a technology referred to as "Rolling ETA" in 1996 [1]. In addition, we
believe that the patent by ArrivalStar dated August 21, 2001 could also potentially
invalidate your patent.

Our preferred response to patent infringement claims is to dispute the claim through
the courts and we have been successful to date. In many cases, the courts have ruled
the patents invalid.

[1]http://www.thefreelibrary.com/HighwayMaster+launches+Rolling+ETA+after+100+percent+successful+test.-a018109586

Regards:

Yukon Palmer
CEO
FieldLogix

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27 **EXHIBIT 5**
28

FieldLogix
8305 Vickers St. Ste. 101
San Diego, CA 92111
Toll Free: 888-803-0200
Fax: 858-863-4060



July 14, 2016

VIA USPS CERTIFIED MAIL

Patent Licensing Alliance
5251 South Green St., Suite 350
Murray, UT 84123

To whom it may concern:

This letter is in response to your letter dated May 6, 2016.

I attempted to reach out to your firm through the provided e-mail address of
kyla@licensingallinace.com on May 16, 2016 requesting the following items:

1. The specific claim in your patent that you believe that we are infringing upon;

2. Your proposed licensing fees;

3. A list of GPS fleet management providers that are currently licensing the technology
claimed in this patent from you.

I have not received a response from you.

*Here is our official response to your claim:*

1. We deny that we are infringing upon patent No. 6,958,701;

2. Prior art exists that could potentially invalidate your patent.

We have successfully disputed patent infringement claims from ArrivalStar S.A. (patent
Nos. 6,714,859 & 6,804,606) regarding the technology also claimed in your patent. In
this case, we discovered prior art from HighwayMaster Corporation who
commercialized a technology referred to as "Rolling ETA" in 1996 [1]. In addition, we
believe that the patent by ArrivalStar dated August 21, 2001 could also potentially
invalidate your patent.

Our preferred response to patent infringement claims is to dispute the claim through
the courts and we have been successful to date. In many cases, the courts have ruled
the patents invalid.

[1]http://www.thefreelibrary.com/HighwayMaster+launches+Rolling+ETA+after+100+percent+successful+test.-a018109586

Regards:

Yukon Palmer
CEO
FieldLogix

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

EXHIBIT 6

28



## Response to Letter Dated May 6, 2016 Regarding Patent No. 6,958,701

**Joseph Pia** <joe.pia@padrm.com>                                                             Wed, Jul 27, 2016 at 10:07 AM
To: "yjpalmer@fieldtechnologies.com" <yjpalmer@fieldtechnologies.com>
Cc: Kyla Welch <kyla@licensingalliance.com>

Dear Yukon,

I and my firm are litigation counsel for Virtual Fleet. We have and continue to bring suits with respect to this patented technology. My client believes that a better route with FieldLogix is a business discussion. Consequently, we'd like to continue to pursue such discussions as long as you are willing to meaningfully participate in the process.

To answer your questions, please see my responses below:

*1. The specific claim in your patent that you believe that we are infringing upon;*

**Attached to this email is a copy of the claim chart showing an analysis of claims 10 and 14.**

*2. Your proposed licensing fees;*

**Attached to this email is a draft perpetual, paid-in full license agreement with the license fee of $11,000 per year for the remaining life of the patent, 7 years. We estimate this to be about 1% of sales. Virtual Fleet will consider a counter offer, and if you prefer, a lump sum payment rather than ongoing payments.**

*3. A list of GPS fleet management providers that are currently licensing the technology claimed in this patent from you.*

**The license agreements are confidential. If you are interested in reviewing some of this information, we will send you a Confidentiality Agreement that once signed will give us some latitude in discussing other agreements on a purely confidential basis.**

As mentioned above, my and my firm's involvement with the client is primarily for litigation purposes. We encourage you to continue discussions with Kyla, who represents Virtual Fleet in its business discussions. She is quite capable of working out an arrangement with you on terms acceptable to both sides.

Joe Pia

PIA ANDERSON DORIUS REYNARD & MOSS
Salt Lake City: 136 E. South Temple Street, Suite 1900, UT 84111
Milwaukee: 400 North Broadway, Suite 303, WI 53202
Dallas:        925 South Main Street, Suite 3412, TX 76051
P. 801-350-9000    F. 801-350-9010    Asst: 801-350-9014
Joe.Pia@PADRM.com www.PADRM.com

----------------

**From:** Yukon Palmer [mailto:yjpalmer@fieldtechnologies.com]
**Sent:** Monday, July 18, 2016 5:01 PM
**To:** Kyla Welch <kyla@licensingalliance.com>
**Cc:** legal@fieldtechnologies.com
**Subject:** Response to Letter Dated May 6, 2016 Regarding Patent No. 6,958,701

This letter is in response to your letter dated May 6, 2016.

I attempted to reach out to your firm through the provided e-mail address of kyla@licensingallinace.com on May 16, 2016 requesting the following items:

1. The specific claim in your patent that you believe that we are infringing upon;

2. Your proposed licensing fees;

3. A list of GPS fleet management providers that are currently licensing the technology claimed in this patent from you.

I have not received a response from you.

*Here is our official response to your claim:*

1. We deny that we are infringing upon patent No. 6,958,701;

2. Prior art exists that could potentially invalidate your patent.

We have successfully disputed patent infringement claims from ArrivalStar S.A. (patent Nos. 6,714,859 & 6,804,606) regarding the technology also claimed in your patent.  In this case, we discovered prior art from HighwayMaster Corporation who commercialized a technology referred to as "Rolling ETA" in 1996 (1). In addition, we believe that the patent by ArrivalStar dated August 21, 2001 could also potentially invalidate your patent.

Our preferred response to patent infringement claims is to dispute the claim through the courts and we have been successful to date.  In many cases, the courts have ruled the patents invalid.

A copy of this letter will also be sent to you via certified mail.

Regards,

Yukon Palmer

CEO

FieldLogix

*(1) http://www.thefreelibrary.com/HighwayMaster+launches+Rolling+ETA+after+100+percent+successful+test.-a018109586*

--



**Exhibit B.png**
202K



**Exhibit D.png**
317K



**Exhibit E.png**
160K



**Exhibit F.png**
311K

 **Exhibit A.pdf**
506K

**Exhibit C.pdf**
113K

**Exhibit G.pdf**
6077K

 **FieldLogix Claim Chart.pdf**
674K

**License Agreement[1].docx**
26K